CHIPPEWA & FLAMBEAU IMPROVEMENT COMPANY, Appellant, vs. RAILROAD COMMISSION OF WISCONSIN, Respondent.

*September 15—October 24, 1916.*

*Waters: Reservoir dams: Statutes: Purpose: Repeal and amendment: General and special laws: Regulation of flow and levels at dams in navigable waters: Powers of railroad commission: Flowage rights: Extent: Prescription.*

1. Although the primary purpose of ch. 640, Laws 1911,—authorizing the plaintiff company to construct, acquire, maintain, and operate a system of reservoirs on the headwaters of the Chippewa and Flambeau rivers,—was the storage of large quantities of water for creation and utilization of power, yet *it seems* that the legislature had also in mind the general welfare on all said waters, including the small lakes which are at the headwaters of the rivers named and are really mere enlargements of the rivers themselves.

2. Although repeals by implication are not favored, and acts directed to a special subject are generally to be given effect rather than a general act, yet where the legislative intent to make the general act controlling is apparent, it will be given that effect.

3. Ch. 380, Laws 1915 (sec. 1596—2, Stats.),—empowering the railroad commission, "in the interest of public rights in navigable waters or to promote safety and protect life, health and property," to regulate and control the level and flow of water in all navigable waters and to designate "the maximum level of water that may be impounded and the lowest level of water that may be maintained by any dam heretofore or hereafter constructed and maintained in navigable waters," etc.,—announces a general policy as to all the navigable waters of the state which is applicable to the reservoir dams operated by the plaintiff under the authority of ch. 640, Laws 1911.

4. Ch. 640, Laws 1911 (in which the right to repeal or amend at any time was specifically reserved), was amended by said ch. 380, Laws 1915; and under the latter act the railroad commission was authorized to take into consideration, in fixing levels, the property rights and interests of riparian owners on the lakes at the headwaters of the rivers named in the act of 1911.

5. Having enacted such general law (ch. 380, Laws 1915) in effect declaring that water may not be maintained in any dam in navigable waters at a level which is injurious to the public rights in such waters, or which threatens safety, or imperils life, health, and property, the legislature might properly endow the railroad commission with power to investigate and ascertain the facts and to make such regulations and orders as may be necessary to carry into effect the law in concrete cases; and in so doing it did not delegate legislative power to the commission or confer judicial power upon it.

6. Under sub. 2, sec. 1, ch. 640, Laws 1911,—which preserves to the plaintiff company, on its purchase of an existing dam, all franchises and flowage rights, either perfected or inchoate, possessed by the former owner at the time of the sale,—the burden of proof is on the plaintiff to show that it possesses such rights with respect to a dam at which water levels are fixed by the railroad commission under ch. 380, Laws 1915.

7. Possession of flowage rights on a part of the shore of a reservoir gives no right to flood that part of the shore owned by others.

8. Prescriptive rights in an easement are commensurate only with the actual enjoyment of the easement.

9. Thus, if the water of a dam is kept up only during certain months of the year for the period necessary to create a prescriptive right, the owner of the flowed land being in possession at all other times, no right will be thereby acquired to keep the water up during the remaining months.

10. Maintenance of a log-driving dam by which a head of water is raised in the early spring but immediately reduced by the use of the water in successive rapid miniature floods during the

spring months, so that ordinarily the dam is empty at the beginning of the summer and so remains, gives no prescriptive right of flowage by means of a reservoir dam devoted to the storing of large quantities of water in the spring or wet seasons, to be gradually depleted in times of drouth for the purpose of producing as nearly as possible a uniform flow of water at all seasons in the river below the dam; and a prescriptive right to flow lands by a log-driving dam was not available to the plaintiff company which had bound itself, by acceptance of its charter, to use the dam as a reservoir dam.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

The plaintiff is a corporation authorized by ch. 640, Laws 1911, to maintain a system of water reservoirs on the headwaters of the Chippewa and Flambeau rivers. It acquired and owned a dam in the Manitowish river at the outlet of Rest lake, which had been built in 1888. September 10, 1915, the defendant *Commission* made an order requiring that said dam should be maintained and operated so that at no season should the maximum head of water therein exceed eight feet six inches, nor be less than five feet six inches, except when the reservoir was covered with ice, when it might be lowered to a head of two feet six inches.

This action is an equitable action brought to set aside that order for various reasons hereinafter stated.

The circuit court found the order to be both reasonable and lawful, and from that judgment the plaintiff appeals.

Ch. 640, Laws 1911, is an act designed to provide for the creation of a system of water reservoirs on the rivers named, primarily for the purpose of storing water in seasons of high water and letting it out gradually in seasons of low water, thus producing an uniform flow for the benefit of water powers below. The title and first two sections of the act read as follows:

AN ACT to authorize the *Chippewa and Flambeau Improvement Company* to construct, acquire, maintain, and operate a system of water reservoirs located on the headwaters of the Chippewa and Flambeau rivers

and their tributaries, as described herein, for the purpose of producing a uniform flow of water in the Chippewa and Flambeau rivers and their said tributaries, and thereby improving the navigation and other uses of said streams and diminishing the injury to property both public and private.

*"The people of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

"Section 1.   1. Subject to the supervision and control hereinafter provided for, authority is hereby given unto the *Chippewa and Flambeau Improvement Company,* in order to promote the purposes hereinafter set forth, to create, construct, acquire, maintain, and operate a system of water reservoirs located in or along the Court Oreilles river and its direct or indirect tributaries above the north line of town 38 north, the east and west forks of the Chippewa river and their direct or indirect tributaries above the junction of the same, the Thornapple river and its direct or indirect tributaries above its mouth, Butternut creek and its direct or indirect tributaries above its mouth, the north fork of the Flambeau river and its direct or indirect tributaries above the flowage of the dam authorized to be built by chapter 400 of the Laws of 1905, as amended by chapter 361 of the Laws of 1907, and the south fork of the Flambeau river and its direct or indirect tributaries, including the Elk river, above the junction of said south fork of the Flambeau river and said Elk river, in this state, and for that purpose said grantee may construct, acquire, maintain, and operate all such dams, booms, sluiceways, locks, and other structures in, along, or across any and all of said portions of said rivers and their said tributaries as may be necessary or reasonably convenient to accomplish the purposes of this grant, and may clean out, straighten, deepen, or otherwise improve any of said rivers and tributaries in order to improve the navigation thereof and to prevent injury to property bordering on said waters.

"2. All franchises and all riparian rights and rights of flowage, either perfected or inchoate, howsoever acquired, by any person or any corporation organized to improve the navigation for any purpose of either or any of said rivers or their tributaries, shall be and hereby are made assignable to the *Chippewa and Flambeau Improvement Company,* and shall be

of the same force and effect in the possession and ownership of such assignee to accomplish the purposes of this act *as* the same may have *had* before assignment to accomplish their original purpose.

"Section 2.   1.   The said authority is granted for the purpose of producing as nearly a uniform flow of water as practicable in the Chippewa and Flambeau rivers, through all seasons, by holding back and storing up in said reservoirs the surplus water in times of great supply, and discharging the same in times of drought and a scarcity of water, and thereby, and by other means, improving the navigation of said Chippewa and Flambeau rivers throughout their entire length, for boats, barges, and other water-craft, and for the running, driving, rafting, booming, storing, sorting, and delivering of logs, timber, and lumber, and other forest products, and for the purpose of improving the usefulness of said streams for all public purposes, and of diminishing the damage and injury by floods and freshets to property, both public and private, located along said waters.

"2. It shall be the duty of said *Chippewa and Flambeau Improvement Company* to so manage, operate, and maintain all of its said reservoirs and other works that the purposes aforesaid shall be accomplished to the greatest practical extent and so that as nearly a uniform flow of water as practicable shall be maintained at all times and at all points on said Chippewa and Flambeau rivers; and during the times when it may be found impracticable to maintain at the same time such uniform flow of water throughout the entire length of said rivers, the upper portions of said rivers shall be given preference."

Sec. 3 of the act clothes the company with the power of condemnation of lands and riparian rights requisite for the construction or maintenance of any reservoirs, dams, or improvements necessary to accomplish the purposes of the act. Sec. 4 provides that when the improvements owned or controlled by the company render log driving practicable on any stream, it may collect tolls on the logs driven and shall have the rights and remedies granted to river improvement companies under sec. 1777, Stats.   Said section further gives

the corporation the right (after it has established water reservoirs which will store 1,500,000,000 cubic feet of water which would not be stored by nature) to charge and collect reasonable tolls from water-power owners on said rivers, or their tributaries, who are benefited thereby, not exceeding a certain percentage on the investment, such tolls to be fixed by the *Railroad Commission.* Sec. 5 contains full provisions regulating the manner of determining the rates of toll by the *Commission* and providing for their becoming a lien upon water powers, dams, and flowage rights in case they are not paid. Sec. 6 prohibits the company from purchasing any dam or flowage rights until they have been appraised by the *Commission,* or for any price in excess of such appraisal. It also prohibits the erection of a new dam except upon plans approved by the *Commission,* and requires the company to institute condemnation proceedings to acquire title to any lands which the *Commission* concludes will be necessarily overflowed by any new dam. It also contains the following clause:

"Such railroad commission shall cause the height to which the water may be raised by any dam to be indicated by permanent monuments and bench marks, and shall have supervision and control of the time and extent of the drawing of water from the reservoirs, and the power to compel the maintenance of all reservoirs established."

Sec. 7 provides that all dams maintained by the company shall be subject to the statutes relating to sufficient fishways and shall also have all necessary slides and other necessities for the passage of logs. Sec. 8 declares the act to be a public act, for the accomplishment of public purposes, and that it is to be favorably construed to that end. Sec. 9 reserves the right to repeal or amend the act, provides that if the company shall not have in operation reservoirs with a capacity of 1,500,000,000 cubic feet by January 1, 1913, its rights under the act shall cease, and that the state, whenever it has the constitutional power, may take over all the company's works

for a compensation to be fixed in a certain specified manner. Sec. 10 provides that the act shall not be construed as divesting or releasing any right or interest held by the state or that may be acquired under any law of the United States.

While the proceedings before the *Railroad Commission,* which finally resulted in the making of the order in question, were pending, ch. 380, Laws 1915, was passed, and it was stipulated by all the parties to the proceeding that the *Commission* should proceed and determine the matter with the same force and effect as if the entire proceeding had been commenced and all action taken subsequent to the passage of said ch. 380. By that chapter sec. 1596—2 was added to the Wisconsin Statutes, the first two subdivisions of which are as follows:

"1. The commission, in the interest of public rights in navigable waters or to promote safety and protect life, health and property is empowered to regulate and control the level and flow of water in all navigable waters and may erect, or may order and require bench marks to be erected, upon which shall be designated the maximum level of water that may be impounded and the lowest level of water that may be maintained by any dam heretofore or hereafter constructed and maintained in navigable waters; and shall establish and maintain gauging stations upon the various navigable waters of the state and shall take other steps necessary to determine and record the characteristics of such waters.

"2. The commission is vested with authority and power to investigate and determine all reasonable methods of construction, operation, maintenance, and equipment for any dam so as to conserve and protect all public rights in navigable waters and so as to protect life, health and property; and the construction, operation, maintenance and equipment, or any or all thereof, of dams in navigable waters shall be subject to the supervision of the commission and to the orders and regulations of the commission made or promulgated under the provisions of sections 1596—1 to 1596—26, inclusive, of the statutes."

It appears by the testimony taken in the case that the Rest-

lake dam was constructed in 1888 and was capable of retain-
ing a sixteen-foot head of water. The water area affected by
the dam is about eight square miles and includes a number of
connected lakes. The dam was built by the Chippewa River
Improvement and Log Driving Company under a legislative
charter granted by ch. 449, Laws 1887, to Charles H. Henry,
and by him assigned to said company. By this act Henry
and his assigns were authorized to improve the Flambeau
river "for log-driving purposes" by building and maintaining
dams and other structures, including a dam at the place in
question, the same to be operated for the use and benefit of all
persons desiring to navigate the stream with sawlogs. They
were also empowered to demand certain tolls for logs driven
and were given the powers given to log-driving corporations by
sec. 1777 of the Revised Statutes of 1878 and its amend-
ments. The right to amend or repeal the act was expressly
reserved.

The dam was used for log-driving purposes until the year
1904, although few logs were driven after the year 1897;
then the driving of logs ceased entirely on the river and the
dam necessarily ceased to be used for such purposes.

During the log-driving years a head of about sixteen feet
of water was obtained about the middle of April, when the
driving would begin, and the drives would be finished about
July 1st, when the water would be drawn down to about the
natural level, where it would remain for a period of one to
four months. In 1901 the dam began to be used for reservoir
purposes to some extent and was so used until it was sold to
the plaintiff in 1912. During these three years the maxi-
mum limit of the level was thirteen feet and six inches, while
for much of the time it was twelve and one-half feet, and dur-
ing the last four or five years of that time ten or ten and one-
half feet. From 1901 until 1912 water would be drawn
down to its natural stage during four or five months of the
year, beginning in July and ending in October or November.

During one year, near the end of that period, no use was made of the dam either for log driving or water power; the water was allowed to run off. The plaintiff owns flowage rights on some of the riparian lands flooded by the dam, but how much does not appear. There are many owners on the various lakes as to whom flowage rights have not been obtained unless by prescription. These property owners objected to the maintenance of the dam at the level proposed by the plaintiff, and during the year 1914 the plaintiff applied to the defendant *Commission* for authority to raise the water to a maximum level of ten feet with permission to draw the water down to the natural flow of the water, or zero on the gauge. A number of private property owners appeared upon the hearing of the petition and objected to the granting thereof. Considerable testimony was taken, and the *Commission* finally made the order which is attacked in this action, fixing a maximum level of eight feet six inches and a minimum level of five feet six inches, except when the lake is covered with ice, at which time reduction to a level of two feet six inches is allowed.

It is estimated by the plaintiff's expert witness that the Rest lake dam, at a ten-foot head, has a storage capacity of 1,500,000,000 cubic feet, which would be reduced to 465,000,000 cubic feet under the levels ordered by the *Commission*.

The *Commission* based their order mainly upon the injury caused to riparian property on Rest lake and the other lakes included in the reservoir area by the extreme variations in the level of the water if the plaintiff's request be granted.

In an opinion filed in the matter, the *Commission,* among other things, say:

"Rest lake is one of a large chain of lakes constituting what is known as the Manitowish waters. The dam will affect the level not only on Rest lake, but the lakes heretofore mentioned. The respondent has not shown any reservation

in any deeds under which riparians claim or others claim whose lands will be overflowed if the maximum level asked for by the petitioner is allowed by the *Commission.* The shore line probably exceeds fifty miles, and a ten-foot level will not only overflow a large acreage of land bordering on the lakes, but the level fixed will directly concern the owners of shore property throughout the lakes. The waters are among the most famous summer resort and fishing waters in the state of Wisconsin. Large sums of money have been invested. by resort owners in resorts along the shores of the lakes and on the islands, and the waters are resorted to by thousands from this and adjoining states during the summer seasons. There are many private homes built along the shores of the lake and large sums of money have been put into these improvements. No effort was made to show the amount of investment by property owners along these lakes, and the *Commission* has no data from which it can estimate the amount of this investment, but it is large. For the last two or three years the petitioner has varied the level throughout practically all stages which it now requests may be established.

"The effects of this great variation in water level are plainly visible throughout these lakes. Strenuous efforts have been made by the owners of shore property to in some way protect their shores. Banks are lined with dead trees, logs, rocks, and *débris* in an effort to prevent the shore line from being obliterated. The shore is not only being gradually taken away, but in places the erosion caused by the variation in level is sufficient to cause the receding of the shore line several feet at a time. During the year the water level has been maintained as high as ten feet. At this level there is no shore line, and the disastrous effects upon shore property are only too plainly visible. When the banks give away, large trees fall into the water. In one instance, thirty large green timber trees were counted lying in the lake where the shore had been taken away this year.

"The great damage done to the property owners along the lakes is through the variation in levels and the action of ice and frost. When the level is at ten feet heavy winds cause especially disastrous effects, as there is no shore at that level to protect the banks, which are mainly of a sandy composition and easily washed away. In places the old shore lines have

disappeared leaving perpendicular embankments ten, twelve, and fifteen feet high. The gradual disappearance of what are now islands was fully shown by the testimony. It was also testified that a variation in level desired to be maintained by the company had disastrous effects on the fish and spawn. As the water is extended over large areas, at times of maximum level, the fish extend over these lands, and when the levels are lowered are either caught there or their spawn is left there and destroyed. In consideration of these facts, property owners vigorously protest that the *Commission* should fix levels which will in a measure protect their property, and it seems clear that with the variation and maximum level now maintained they are unable with all their efforts to protect the same.

"On the other hand it is claimed by the company that they are authorized to maintain a reservoir on these lakes, that the act authorizing the reservoir in express terms stated that the *Commission* should allow such levels as would tend to bring about a constant flow in the level below the dam; that the act provided for condemnation proceedings in case it was necessary to secure rights of flowage, and that it was not the intention of the legislature that the *Commission* should do otherwise than allow the highest maximum level for reservoir purposes that was consistent with safety in maintenance and which the company might desire. It will be seen, therefore, that the questions presented are whether the *Railroad Commission* is authorized, in fixing the levels which it will allow the company to maintain, to take into consideration the property rights of those who will be affected by the levels fixed, and if they are to take into consideration such property rights and consider the great value of water storage and also the large investment in property on the Manitowish waters, what levels should the *Commission* say are proper levels?"

The *Commission* concluded that they were authorized and required, in fixing levels, to take into consideration the rights of riparian property owners on the lakes, the damage done to such property, and the injury to fishing, and that the interests of public welfare and the protection of property required that the levels maintained at the dam be limited as before indicated.

*Charles McPherson,* attorney, and *George D. Van Dyke,* of counsel, for the appellant.

For the respondent there was a brief by the *Attorney General* and *E. E. Brossard,* assistant attorney general, and oral argument by *Mr. Brossard.*

WINSLOW, C. J.   It was frankly admitted by appellant's counsel upon the oral argument that by organizing under and accepting the rights and privileges granted by the water-reservoir act (ch. 640, Laws 1911) the appellant had submitted to such supervision and control by the *Railroad Commission* as that act (under reasonable and proper construction) provided for, but it was strenuously contended that the present order was not within the powers granted to the *Commission* by the act, or, if within the powers nominally granted, that such powers could not be constitutionally granted, for various reasons which will be discussed in this opinion.

The first question which naturally presents itself in the case is whether ch. 640 authorizes the *Commission* to consult the property interests of riparian owners upon the reservoir lakes, and make an order fixing levels at a height which will arbitrarily reduce the reservoir capacity, simply for the purpose of preventing injury to said riparian property.   The argument is that the law has one dominant and controlling purpose, namely, the creation of reservoirs at the headwaters of the rivers named, for the purpose of accumulating great stores of water in wet periods and gradually letting it out during dry periods, so that there may be as nearly as practicable an uniform flow of the rivers, thus doing away with disastrous floods and insuring to water-power owners below a supply of water during the entire year.

The argument is well and strongly made.   Certainly, this must be conceded to be the primary purpose.   There is, however, language that seems to indicate that the storage of water in as large quantities as possible is not the sole purpose, but that the legislature had also in mind the general welfare on

all of the waters covered by the act; and by "all of the waters" we mean not merely the Chippewa and Flambeau rivers proper, but also the small lakes in question here which abound at their headwaters, and really are merely enlargements of the rivers themselves. Thus the title to the act declares that the reservoirs to be constructed are for the purpose of producing a uniform flow of water in the rivers named and their tributaries "and thereby improving the navigation *and other uses* of said streams and *diminishing the injury to property* both public and private." Again, at the close of the first subdivision of sec. 1 power is given to clean out, deepen, or otherwise improve any of the rivers or tributaries in order to improve the navigation thereof *and to prevent injury to property* bordering on said waters. So at the close of sub. 1 of sec. 2, after stating the fundamental purpose of the authority granted, there is added, "the purpose of improving the usefulness of said streams for *all public purposes,* and of diminishing the damage and injury by floods and freshets *to property, both public and private,* located along said waters;" while in the second subdivision of the section it is made the duty of the plaintiff to so operate its works "that the purposes aforesaid shall be accomplished to the greatest practical extent and so that as nearly a uniform flow of water as practicable shall be maintained at all times and at all points . . . ; and during the times when it may be found impracticable to maintain at the same time such uniform flow of water throughout the entire length of said rivers, the upper portions of said rivers shall be given preference."

There seem in these provisions to be quite plain indications that the legislative thought included other public purposes than the mere storage of immense quantities of water for creation of power, and that it was appreciated that there might well arise a conflict between the various purposes, in which event all the public interests were to be recognized and protected so far as practicable.

We do not find it necessary, however, to decide this ques-

tion.    While this application was pending before the *Railroad Commission* ch. 380 of the Laws of 1915 was passed, and it was stipulated that the *Commission* might proceed to a determination of the matter with the same effect as if the proceeding had been commenced after that act became effective. We have therefore to consider the effect of that act (sec. 1596—2, Stats. 1915), the material portions of which have already been set out in the statement of facts.

It will be remembered that the right to repeal or amend at any time was specifically reserved in the law under which the plaintiff was organized and is acting, viz. ch. 640, Laws 1911. It is true that repeals by implication are not favored and that acts directed to a special subject are generally to be given effect rather than a general act; yet it is equally true that where the legislative intent to make the general act controlling is apparent it will be given that effect.    *Gymnastic Asso. v. Milwaukee,* 129 Wis. 429, 109 N. W. 109.    In the present case the act of 1915 seems unquestionably intended to apply to all dams in the state.    A general policy applicable to all the navigable waters of the state was there announced, and we can entertain no doubt of the intention to make it applicable to the reservoir dams operated by the plaintiff.    This act gives ample and broad powers to the *Commission* to regulate and control the navigable waters of the state and to fix the maximum and minimum levels that may be maintained "by any dam heretofore or hereafter constructed" "in the interest of the public rights" or "to promote safety and protect life, health and property."

Here the legislature has performed the legislative function by declaring that water may not.be maintained in any dam in navigable waters at a level which is injurious to the public rights in such waters, or which threatens safety, or imperils life, health, and property.    Having enacted this general law, the legislature has endowed the *Railroad Commission* with power to investigate and ascertain the facts and to make

such regulations and orders as may be necessary to carry into effect the law in concrete cases.

That this may be lawfully done, and that legislative power is not thereby delegated nor judicial power conferred, are propositions too well established to admit of doubt. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905; *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209. It has always been and still is the function of a jury to fix the reasonable height of a dam erected under the general milldam law (ch. 146, Stats.), and it has never been supposed that in exercising this function a jury was exercising legislative power.

The question arises whether the plaintiff has shown itself possessed of any vested property rights under and by virtue of the Henry franchise, and its purchase of the dam from the assignee of Henry, which have been specifically preserved under the provisions of sub. 2, sec. 1, ch. 640, aforesaid. This section in effect preserves to the plaintiff, on its purchase of an existing dam, all franchises and flowage rights, either perfected or inchoate, possessed by the former owner at the time of the sale. It may be noted in passing that two typographical errors appear in this section as printed in the session laws. The writer has examined the original act as preserved in the office of the secretary of state and has caused the section to be correctly printed in the statement of the case herein, the two words which are erroneously printed in the session laws being printed in italics in the statement.

It seems very clear that the burden of proof is on the plaintiff to show that it possessed such rights with relation to the dam in question. There would be no presumption in its favor. We are well satisfied that the plaintiff did not show that its assignor possessed the necessary flowage rights to entitle it to maintain this dam for reservoir purposes, either by condemnation, ownership of the flowage lands, or by prescription. So far as condemnation is concerned there was an en-

tire absence of evidence.   As to ownership by purchase, one witness testified that the Chippewa Lumber and Boom Company owned land abutting on the reservoir, that it bought about 4,200 acres there in 1900, and that when it sold the lands it reserved flowage rights.   How much of this land abutted on the reservoir is nowhere stated, and it appears affirmatively that there are large tracts of overflowed riparian property owned by third persons.   The possession of flowage rights on a part of the shore certainly gives no right to flood that part of the shore owned by others.   It may be remarked that the plaintiff obtained its title to the dam from the *Chippewa River Improvement and Log Driving Company,* and that it is established in the case that this latter company purchased the franchise of Henry in 1888 and built the dam owned by it until 1912, when it was purchased by the plaintiff.   Nowhere does it appear that the *Chippewa Lumber and Boom Company,* which is said to have owned the flowage rights, ever owned the dam or transferred any rights to the plaintiff.   However, we assume that this is a mere confusion in names and that in fact the plaintiff's grantor is the corporation which was the owner of the flowage rights testified to by the witness.

But it is said that rights of flowage have been obtained by prescription which are preserved to the plaintiff by the section of ch. 640 last quoted.   In considering this claim it is always to be borne in mind that prescriptive rights in an easement are commensurate only with the actual enjoyment of the easement.   Angell, Watercourses (7th ed.) §§ 224, 379; Washburn, Easem. & S. (4th ed.) 135; 14 Cyc. 1200; *Koenigs v. Jung,* 73 Wis. 178, 40 N. W. 801; *Darlington v. Painter,* 7 Pa. St. 473; *Hart v. Chalker,* 5 Conn. 311.

If the water of a dam is kept up only during certain months of the year for the full period necessary to create a prescriptive right, the owner of the land being in possession at all other times, no right will be thereby acquired to keep the wa-

ter up during the remaining months. *Carlisle v. Cooper,* 21 N. J. Eq. 576; *Marcly v. Shults,* 29 N. Y. 346. The resulting prescriptive easement is confined to the months during which the level has been maintained. *Swan v. Munch,* 65 Minn. 500, 67 N. W. 1022.

The idea is that the adverse use of land for a certain three months of each year for a series of years, while it may give a prescriptive right for those months, does not give any prescriptive right during the other nine months of the year.

A log-driving dam is not built for storage purposes or for keeping a constant head of water during the year, but for the raising of a head of water in the early spring and immediately using such water in successive rapid miniature floods during the spring months. The reservoir dam is built for the purpose of storing up a great quantity of water during the spring and conserving it for gradual depletion during the summer season. In the one case the normal situation is that the dam is empty at the beginning of the summer and so remains, while in the other case it is full at the beginning of the summer and remains so, subject only to slow reduction when it becomes necessary to supplement the natural flow of the river which has become lessened by long continued dry weather. These uses are practically the antitheses of each other. The testimony in this case affirmatively shows that during the busy logging years and up to 1901 the water in the dam reached the maximum head of about sixteen feet in April and by the 1st of July was down nearly or quite to the natural level. Sometimes there was some accumulation of water during the summer, but only in case the summer was wet, and even in that case it does not appear that during the summer months any head exceeding eight feet and six inches was ever reached, much less maintained. The testimony also shows practically the same condition from 1901 until 1912. During the earlier years of this later period the maximum level reached in April was about thirteen feet and during the later

years about ten or eleven feet.    From July 1st to October or November the water was generally drawn down nearly or quite to its natural level, while the level during the rest of the year does not appear.

The plaintiff contends that the purpose of ch. 640, Laws 1911, is (quoting from the brief) "that the flow of water in the river below the reservoir shall be kept as nearly uniform as practicable at all seasons of the year."    Granting that this is the purpose, it is plain that the supposed prescriptive right of flowage does not in any way help to attain that purpose, but is in fact inconsistent with its attainment.    To accumulate water in April in order to expend it riotously in May and June is absolutely destructive of the usefulness of the dam as a reservoir.    The plaintiff is here as the owner of a reservoir dam, not a log-driving dam.    It claims that this dam is devoted to "a specific public use, i. e. obtaining as nearly as possible a uniform flow of water in the Flambeau and Chippewa rivers below the dam."    To attain this public purpose it must necessarily store up water in wet seasons in order to gradually dole it out in long periods of drouth.    If any prescriptive rights to flow lands were obtained by the owners of the dam before its purchase by the plaintiff they were not rights to do this, but rights to acquire a maximum head of water in April and reduce it to zero by July 1st.

By accepting its charter the plaintiff doubtless bound itself to carry out the purposes of that charter.    The prescriptive right which it now claims is a right which, if exercised in accordance with the use upon which it is based, would destroy the usefulness of the dam for the charter purposes, hence it can avail the plaintiff nothing.

It does not seem necessary to say more.    When it is held that plaintiff's charter (ch. 640, Laws 1911) was amended by ch. 380, Laws 1915, it necessarily follows, as it seems to us, that the *Commission* in making its order might rightfully consider the interests of riparian property owners on the reser-

voir area; and when it is held that no prescriptive rights were obtained by the plaintiff when it purchased the dam which can interfere with the order, it seems that all questions as to the supposed taking of property without due process of law disappear.   As already indicated, there is in our judgment no invasion of legislative or judicial power in the making of the order, and we are unable to say that the order is in any way unreasonable.

*By the Court.*—Judgment affirmed.