BURKMAN and another, Respondents, vs. CITY OF NEW LISBON, Appellant.*

*January 17—March 16, 1945.*

* Motion for rehearing denied, with $25 costs, on June 15, 1945.

*C. E. Macomber,* city attorney of New Lisbon, and *William Ryan* of Madison, for the appellant.

For the respondents there were briefs by *Donovan, Gleiss & Goodman* of Sparta, and oral argument by *L. J. Goodman.*

MARTIN, J. On April 12, 1943, plaintiffs petitioned the Hon. ROBERT P. CLARK, county judge of Juneau county, for the appointment of commissioners to make an award for damages to lands owned by them, alleged to have been taken

by flowage by backwater from a dam owned and operated by appellant.

The petitioners, hereinafter referred to as the "plaintiffs," allege that they and their predecessors in title have been in possession, and the owners in fee simple, of the lands described for more than fifty years; that on or about August 1, 1937, the city of New Lisbon, a municipal corporation located in Juneau county, proceeded to construct a dam in the city of New Lisbon on the Lemonweir river for the purpose of creating a public park, parkways, pleasure drives, playgrounds, and water facilities for said city; that said dam was built and constructed by virtue of a permit of the public service commission of Wisconsin dated February 25, 1937; that the construction of said dam was completed on or about August 1, 1938; that the city of New Lisbon has continued to operate said dam from the completion thereof to the commencement of these proceedings; that the lands described constitute farm lands and have been used as such by plaintiffs and their predecessors in title for more than thirty years.

It is further alleged that the construction and operation of the dam has caused the level of the water in the Lemonweir river immediately adjoining and above said dam to be increased and raised to such a height that it has overflowed, destroyed, and otherwise seriously damaged, and will continue to overflow, destroy, and seriously damage in the future, the lands of plaintiffs for agricultural purposes, without any right so to do and without any payment therefor or acquisition thereof; that the city of New Lisbon commenced condemnation proceedings to acquire the lands here in question, or a portion thereof, on or about the 1st day of October, 1936; that the property owners demurred to the petition, the county court sustained the demurrer, and this court, on appeal, also sustained the demurrer, and the city has never since taken any action to commence and prosecute condemnation proceedings. (See *New Lisbon v. Harebo*, 224 Wis. 66, 271 N. W. 659.)

Defendant admits the construction of said dam for the purposes alleged, and that it has continued to operate the dam since on or about August 1, 1938. Defendant denies that the operation of said dam has caused the level of the water in the Lemonweir river to be increased to such a height that it has overflowed, destroyed, or otherwise seriously damaged the lands of plaintiffs for agricultural purposes. Defendant alleges:

"That the lands described in the petition are impressed and subject to flowage rights; that said lands were subject to flowage rights at the time petitioners purchased the same, and for a long time prior thereto; and were so subject to flowage rights at the time the said city of New Lisbon constructed its dam, and still are, and that said city of New Lisbon is the rightful owner and holder of such flowage rights and has a good and lawful right to maintain the level of the water in the said Lemonweir river above the dam and on the petitioners' land at the height now existing and produced by said dam."

As a further defense, by way of estoppel, the defendant alleges:

"Further answering the petition and as a further defense thereto the respondent city of New Lisbon alleges that said petitioners, with others, interposed a demurrer to condemnation proceedings instituted by this respondent before construction of the said dam was commenced, which issue culminated in the opinion by the supreme court of Wisconsin, dated February 9, 1937, as alleged in the petition; that since said decision petitioners have had full knowledge of every action taken by the said city of New Lisbon in respect to the building and construction of its said dam, but that the petitioners made no complaint or objection thereto or instituted any condemnation or other proceedings during the time of building and construction of said dam, or at any other time, prior to the filing of their petition herein, and therefore, they are now estopped from being granted the relief prayed for in their petition."

The county judge of Juneau county made findings that plaintiffs are the owners of the premises described; that a portion of same has been taken by the city for a public purpose and

without compensation; and that plaintiffs are entitled to proceed in the condemnation and to have appraisers appointed to ascertain the compensation to be made for the property taken. On May 12, 1943, he entered an order appointing three commissioners. On July 9, 1943, the commissioners made their report in which, among other facts found, they determined the compensation to be made to the owners for damages sustained by them in the sum of $1,735. The city took an appeal from the award of the commissioners to the circuit court for Juneau county. The case was tried to the court and jury. The following special verdict was returned:

"Question 1: Did the dam constructed by the city of New Lisbon, in 1938, cause damage to petitioners' property described in the petition by causing an extra amount of water to enter on and through said land? Answer: Yes.
"Question 2: If you have answered question one 'Yes,' then answer this question: At what sum of money do you assess petitioners' damages? Answer: $2,250."

The court made extensive findings of fact. Those here material are, in substance, as follows: That plaintiffs and their predecessors in title have owned and been in possession of the premises in question for more than sixty years, and that none of the conveyances, from the original entry down to the time plaintiffs acquired their title by warranty deed on August 22, 1923, made any mention of said premises being subject to any flowage rights; that there was a dam in existence and in operation in the city of New Lisbon prior to 1906 or 1907, at which time said dam washed out, and that no dam was in existence between that date and the construction of the present dam in 1938; that the old dam was as high as, or possibly six inches higher than, the present dam, and that there has been no evidence of the plaintiffs establishing any perceptible difference in the extent of the lands overflowed by the old or the new dam; that plaintiffs purchased the premises in 1923 and have worked the same as a farm unit since that time; that after the new dam was constructed the water backed

onto plaintiffs' land, depriving them of approximately one half of their original twenty-nine acres of work land, depriving them of some twenty acres of pasture, and affecting a portion of the remaining acreage; that the dam constructed in 1938 caused the plaintiffs damage to their property of about fifty per cent of the actual value as it was at the time they purchased it, since which time they have made some valuable improvements.

The court further found that the city offered some proof that the old dam, which was in existence prior to 1907, flooded a portion of plaintiffs' land; that there was no evidence that clearly showed what portion, if any, of such lands was overflowed; that there was no evidence of such lands being overflowed continuously and uninterruptedly for a period of more than twenty years, so as to establish a prescriptive right of flowage to any particular portion of the farm; that from the evidence produced the court could in no way conclude that a portion of the land was flooded because of the existence of the old dam; that the court was unable to determine what portion was flooded, whether it consisted of less than an acre or many acres; that the evidence produced by the city in regard to the flooding by the old dam was not clear and sufficient so that the court could determine that any particular portion of the farm was flooded.

The court further found that the city acquired the property upon which it constructed its dam from the Wisconsin Power & Light Company by warranty deed dated November 19, 1936; that said deed disclosed no reference to the premises of the plaintiffs and did not grant to the city flowage rights; that the only words used in the deed from which the city could conceive it had acquired any flowage rights were as follows:

"No part of the above-described premises shall be used for, and there shall not be constructed or built on any part of said premises any dam, reservoir, or means of any kind for the production or generation of water or electric power, either on said premises or otherwise, nor shall said land be flowed or

used for flowage purposes for the production of water or electric power either on or off the premises."

The court further found that the city of New Lisbon in October, 1936, commenced an action in the county court of Juneau county to condemn the lands in question, together with other lands; that the commencement of such action by the city clearly showed and indicated that it did not have any flowage rights on the lands of the plaintiffs for the reason that if it had such rights it would not have been necessary for it to commence such proceedings; that the city by such action, if for no other reason, is estopped from now attempting to assert that it has flowage rights upon the plaintiffs' premises; that the old dam was not in existence between the years 1907 to 1938; that during all that time plaintiffs and their predecessors owned and operated the premises without any flowage thereon; that in 1923 plaintiffs acquired the property without any record of any flowage rights shown upon their abstract, and operated their farm without any knowledge of anyone contending that they had flowage rights until after the new dam was constructed in 1938; that the burden of proof that the city acquired rights of flowage by prescription is upon the city, and that it has failed to show by sufficient credible evidence that it acquired such rights; that it has entirely failed to show what portions of the lands were flooded by the old dam, whether it was one acre or ten acres, for what length of time the water covered the land, or what land was covered merely by seepage.

The court further found that the city of New Lisbon never acquired any flowage rights upon the lands in question by prescription or otherwise; that if the predecessors in title did acquire flowage rights by prescription such rights were lost by nonuser for a period of more than thirty years. The court below did not make a specific finding that the city's predecessors in title had acquired flowage rights by prescription. However, the court did find that if the city's predecessors in title did acquire flowage rights by prescription, such rights were lost by nonuser for a period of more than thirty years.

Plaintiffs offered no evidence as to the flowage caused by the old dam. All of plaintiffs' witnesses testified as to the extent of the flowage since construction of the new dam in 1938 as compared with the flowage occasioned by seasons of freshets during the period from the time the old dam was washed out until the construction of the new dam. The comparison should have been the extent of the flowage caused by the old dam and the new dam. Several of the plaintiffs' witnesses testified in detail as to the extent of the flowage on plaintiffs' land after the new dam was constructed. Several of the defendant's witnesses who had intimate personal knowledge as to the extent of the flowage caused by the old dam, testified that the flowage on the lands in question was greater than the flowage thereon since the construction of the new dam in 1938. It is conceded that the old dam caused the lands in question to be overflowed for more than twenty years prior to 1906 or 1907, whichever year it was washed out. The trial court found:

"That the old dam was as high or possibly six inches higher than the present dam, and that there has been no evidence of the plaintiffs establishing any perceptible difference in the extent of the lands overflowed by the old or the new dam."

We are of the opinion that the evidence compels a finding that the owner or owners of the old dam did acquire flowage rights by prescription. The court found that if the predecessors in title had acquired flowage rights by prescription, such rights were lost by nonuser for a period of more than thirty years. Nonuser is evidence of abandonment. It is the abandonment of the prescriptive rights that destroys such rights.

In *Johnson v. Boorman,* 63 Wis. 268, 272, 22 N. W. 514, involving the correctness of the lower court's charge in a flowage case, where the right of flowage was acquired by prescription, the court said:

"So the jury were instructed that if they found from the evidence that for any consecutive ten years since 1852 the defendant had maintained the dam so as to cause the water to set back upon and overflow the plaintiffs' land to the extent it was flowed at the time of the trial, or had been for the previous four or five years, then his right thus to flow the same was perfect, *unless he had lost that right by an abandonment of it for ten other succeeding years.* Or, to state the proposition in another way, that the defendant would acquire a prescriptive right to flow the plaintiffs' land to the extent claimed by what amounted practically to uninterrupted use for ten years; *that he would lose the right thus acquired if he had abandoned it for ten other succeeding years.* This was the pith or substance of the charge on this point. . . .

"And when the prescriptive right has been once acquired, it will not be lost by nonuser alone for a less period than ten years."

That case involved flowage caused by a milldam. In the instant case the old dam was a milldam; thus, the prescriptive right is acquired in ten years.

In *Badger State Bank v. Finkler Motor Car Co.* 216 Wis. 160, 164, 256 N. W. 628, the court said:

"Intent to abandon a known right may appear conclusively as a legal result of conduct as well as by the existence of actual and expressed intent."

In *Somers v. Germania Nat. Bank,* 152 Wis. 210, 219, 138 N. W. 713, quoting from *Pabst Brewing Co. v. Milwaukee,* 126 Wis. 110, 105 N. W. 563, the court said:

"The actuating motive, or the intention to abandon a right, is generally a matter of inference to be deduced with more or less certainty from the external and visible acts of the party, and all the accompanying circumstances of the transaction, regardless of whether there was an actual or expressed intent to waive, or even if there was an actual but undisclosed intention to the contrary."

"It is well settled that in order to constitute an abandonment of property there must be a relinquishment coupled with

an intent to part with it permanently." *State v. Murray*, 195 Wis. 657, 659, 219 N. W. 271, and cases there cited.

In Restatement, 5 Property, p. 3076, sec. 504, it is stated:

"An easement may be extinguished by an intentional relinquishment thereof indicated by conduct respecting the use authorized thereby.

"Comment:

"*a*. . . .

"*b*. . . .

"*c. Conduct as to use.* An intentional relinquishment of an easement indicated by conduct respecting the use authorized by it constitutes an abandonment of the easement. The intention required in the abandonment of an easement is the intention not to make in the future the uses authorized by it. The benefit of an easement lies in the privilege of use of the land subject to it. There is no abandonment unless there is a giving up of that use. The giving up must be evidenced by conduct respecting the use of such a character as to indicate an intention to give up the use for the future as well as for the present. Conduct, when inconsistent with the continuance of the use, indicates an intention to give it up. The conduct required for abandonment cannot consist of verbal expressions of intention. Such expressions are effective to extinguish an easement only when they comply with the requirements of a release and operate as such. Verbal expressions of an intention to abandon are relevant, however, for the purpose of giving meaning to acts which are susceptible of being interpreted as indicating an intention to give up the use authorized by an easement, but which do not of themselves conclusively demonstrate the intention which animated them.

"*d. Nonuse.* Conduct from which an intention to abandon an easement may be inferred may consist in a failure to make the use authorized. Nonuse does not of itself produce an abandonment no matter how long continued. It but evidences the necessary intention. Its effectiveness as evidence is dependent upon the circumstances. Under some circumstances a relatively short period of nonuse may be sufficient to give rise to the necessary inference; under other circumstances a relatively long period may be insufficient. The duration of the period of nonuse, though never conclusive as to the intention to abandon, is ordinarily admissible for the purpose of showing intention in that regard."

In *Johnson v. Boorman, supra,* which involved prescriptive rights to flow lands, acquired by the exercise of the right for a period of ten years, it was held that the rights thus acquired would be lost if abandoned for ten other succeeding years. An easement to flow lands never ripens into any title to the lands flowed. It is distinguishable from a title to lands acquired by adverse possession. An easement may be abandoned more readily than can most interests in land. See Restatement, 5 Property, p. 3076, sec. 504, comment *a.*

Whether or not a right to flow lands acquired by prescription has been abandoned by nonuser does not depend on the length of the nonuser, but is a question of fact to be determined from the surrounding circumstances. 27 R. C. L. p. 1299, sec. 210. Nonuser of a prescriptive right may be considered as evidence in determining whether an easement by prescription has been abandoned.

It is conceded by appellant that there was a nonuser of flowage rights from 1906 or 1907 to 1938. The mill on the dam site, originally used as a sawmill and later as a gristmill operated by water power created by the old dam, was destroyed or removed. For a period of more than thirty years no dam was in existence, and no flowage rights were exercised on the lands of the plaintiffs or their predecessors in title. From 1910 to 1936 the dam site was continuously owned by companies primarily engaged in the production, transmission, and sale of electric power; namely, the Mauston Electric Service Company and the Wisconsin Power & Light Company. Neither made any move to restore the old dam or to exercise flowage rights in any manner on the plaintiffs' property. In 1936 appellant commenced condemnation proceedings to acquire, among other lands, the lands in question. These condemnation proceedings were later abandoned.

We cannot say that the court's finding that the flowage rights, if such had been acquired by prescription, had been lost, is against the great weight and clear preponderance of the evidence. While the trial court refers to the rights having

been lost by nonuser, which is evidence of an abandonment of the easement, we are of the opinion that the nonuser taken in connection with the other undisputed facts sustains a finding that any prescriptive rights which the appellant or its predecessors may have had were lost by abandonment.

Appellant contends that incompetent evidence as to the amount of damages was received over its objection. We find no error in this regard. The damages awarded are sustained by the evidence.

*By the Court.*—Judgment affirmed.

The following opinion was filed June 15, 1945:

MARTIN, J. (*on motion for rehearing*). Defendant-appellant has filed a motion for rehearing, in support of which several contentions are made. Appellant contends that the opinion, filed March 16, 1945, overlooked certain important facts: First, the deed of March 8, 1910, from C. A. Veeder to the Mauston Electric Service Company, which conveyed an undivided one-half interest in the dam site, and which deed contains the following language:

" . .. . Also the water power and the milldam across the Lemonweir river belonging to and connected with said gristmill, and the right of flowage occasioned by said milldam, and by keeping, maintaining and continuing the same; . . . also all interest of the said party of the first part [C. A. Veeder] in the rights and privileges granted by chapter 237, Laws of Wisconsin, for the year 1857."

Secondly, the deed from the Mauston Electric Service Company to the Wisconsin Power & Light Company dated July 20, 1932, which deed conveyed the dam site, and also contains the following language:

" . . . Also hereby conveying any rights the Mauston Electric Service Company may have by deed, prescription or otherwise to flow lands on sections 5 and 8, T. 16 N. R. 3 east, by means of the dam situated on said outlots 29 and 31, of Miscellaneous Plat of the Village of New Lisbon.

"Also: All the interest of A. K. Owen and George Cawthorne in the rights and privileges granted by chapter 237, Laws of Wisconsin, for the year 1857."

Ch. 237, P. & L. Laws of 1857, was an act authorizing Amasa Wilson to build and maintain a dam across the Lemonweir river. Sec. 1 of said act provides:

"Amasa Wilson and his associates, successors, heirs and assigns, are hereby authorized to erect and maintain a dam across the Lemonweir river, on sections seven and eight, in town sixteen, range three east, in the county of Juneau, and to make use of the water of said river for hydraulic purposes."

Sec. 2 provides:

"Said dam shall not exceed ten feet in height from the ordinary water line of said river, and shall be so constructed as to admit the passage of logs, rafts, timber and water crafts, which shall at all times be entitled to pass said dam free of all charges, to the owner or owners thereof; *Provided*, that the erection and maintenance of said dam shall in no ways infringe upon the rights of other persons not herein named."

It should be noted that the erection and maintenance of the dam shall in no ways infringe upon the rights of others.

It appears that the old dam was originally used to operate a sawmill and later to operate a gristmill. It does not appear when these mills were removed. No mill has been operated since the dam was washed out in 1906 or 1907. At the time Veeder conveyed to the Mauston Electric Service Company there was neither milldam nor water power then in existence. There may have been flowage rights but such rights were never exercised from the time the old dam was washed out until the new dam was constructed by defendant city in 1938. At the time the Mauston Electric Service Company conveyed to the Wisconsin Power & Light Company on July 20, 1932, there was neither milldam nor water power in existence. In the deed, dated November 19, 1936, from the Wisconsin Power & Light Company to appellant city is the following provision:

"No part of the above-described premises shall be used for, and there shall not be constructed or built on any part of said premises any dam, reservoir, or means of any kind for the production or generation of water or electric power, either on

said premises or otherwise, nor shall said lands be flowed or used for flowage purposes for the production of water or electric power either on or off the premises;"

What was originally acquired by prescription was the right, under the Milldam Act, to operate a mill on the premises adjacent to the dam and to floqd land to make a head to create water power for that purpose. That is the utmost that the Wisconsin Power & Light Company acquired. Assuming that it did acquire that right, when it conveyed the premises adjacent to the dam to the city it lost its right—that is, it abandoned its right—to operate a mill on those premises. By the terms of its deed quoted above it did not cónvey that right to the city but precluded the city from exercising that right. As the city did not acquire a right to operate a mill it has acquired no right to maintain a dam and no right to flood plaintiffs' lands by a dam.

Appellant contends that the opinion proceeds on the basis of sustaining a finding that the owners' prescriptive rights of flowage were abandoned, whereas the trial court made no finding that the flowage rights were abandoned, the finding being merely that the flowage rights were lost by nonuser. It is true that the trial court found "that the flowage rights were lost by nonuse for a period of more than thirty years." The trial court was correct as to the period of nonuse. Nonuse alone, whether it be for ten years under the Milldam Act or twenty years under the general statute, does not constitute an abandonment of a prescriptive right; but in the instant case such nonuse is the strongest evidence of an intent to abandon the flowage rights. The question of intent was not submitted to the jury. There was no request that that issue be submitted to the jury. In this connection, the record discloses that at the close of the testimony the court said:

"After hearing this testimony, the court is of the opinion that there are only two questions to be submitted to the jury in this case as jury questions:

"Question 1. Did the dam constructed by the city of New Lisbon in 1938 cause damage to petitioners property described

in the petition by causing an extra amount of water to enter on and through said lands?

"Question 2.   If you have answered question one 'Yes' then answer this question: At what sum of money do you assess petitioners' damages?"

The court then remarked:

"I think the other questions in here are all legal questions."

Thereupon Mr. Ryan moved that the court dismiss the plaintiffs' complaint or petition for the reason that the city of New Lisbon has flowage rights acquired by prescription both at common law and under the milldam statute; that there was no testimony showing those rights had been either abandoned by the owner or acquired by any adverse possession on the part of the plaintiffs.   The court then said:

"The motion will be overruled.   The court will have to pass on these things later."

In *Bratz v. Stark,* 138 Wis. 599, 120 N. W. 396, it was held that failure to submit a question even in the presence of conflicting evidence, in the absence of a special request by appellant, need not reverse the judgment; for even if the evidence was not conclusive it was sufficient to support a finding by the trial court that there was no negligence in permitting the escape of that fire.

Appellant states:

"There is implicit in the findings of the trial court the position that there was no proof in this case to support a jury finding of intention on the part of the owners to part permanently with the easements.   Had there been any evidence to support a finding of an intention on the part of the owners to part permanently with the flowage easements, the court would have submitted the question to the jury."

The respondents argue that the trial court did actually make a finding of abandonment although it did not specifically use the word "abandonment."   The court did specifically find that the city of New Lisbon acquired no flowage rights whatsoever from the Wisconsin Power & Light Company by the deed of November 19, 1936.   The court made this finding

at least in part based on the provision in the deed from the Wisconsin Power & Light Company hereinbefore quoted. We think it must be held that any flowage rights acquired by prescription were rights under the Milldam Act to which reference is made above, and that the original dam was maintained solely for the purpose of creating such water power by flooding lands, thus creating the necessary water power to operate, in the first instance, the sawmill, and later the gristmill. The deed from the Wisconsin Power & Light Company to the city would preclude the city from constructing a dam to create water power to operate a mill. It follows that the city has no right to flood the plaintiffs' land by the dam constructed in 1938.

Assuming that the Mauston Electric Service Company and the Wisconsin Power & Light Company had acquired any flowage rights by prescription, such rights would be limited to the construction of a dam to create water power for the operation of such mill or mills as were operated on the old dam site. Their respective conveyances, that is, the deed from the Mauston Electric Service Company to the Wisconsin Power & Light Company and the deed from the Wisconsin Power & Light Company to the city of New Lisbon, would be a positive abandonment of their right to operate a mill on the site of the old dam, or to construct and maintain a dam for such purpose.

In *Chippewa & F. Imp. Co. v. Railroad Comm.* 164 Wis. 105, 120, 159 N. W. 739, which involved flowage rights, the court said:

"In considering this claim [rights of flowage by prescription] it is always to be borne in mind that prescriptive rights in an easement are commensurate only with the actual enjoyment of the easement." Citing Angell, Watercourses (7th ed.), secs. 224, 379; Washburn, Easem. & S. (4th ed.) 135; 14 Cyc. 1200; *Koenigs v. Jung,* 73 Wis. 178, 40 N. W. 801; *Darlington v. Painter,* 7 Pa. St. 473; *Hart v. Chalker,* 5 Conn. 311.

In *Metropolitan Inv. Co. v. Milwaukee,* 165 Wis. 216, 220, 161 N. W. 785, the court held:

"No right acquired by prescriptive use exceeds the extent of the use." Citing *Chippewa & F. Imp. Co. v. Railroad Comm., supra.*

In 17 Am. Jur. p. 973, sec. 62, it is stated:

" . . . To entitle a person to an easement by prescription, he must show that he has always used the right claimed without change or variation. The right derived from use does not exceed the user in which it has its origin. . . . "

At p. 996, sec. 98, it is stated:

"The use of an easement must be confined strictly to the purposes for which it was granted or reserved. . . . "

At p. 997, sec. 100, it is said:

"If an easement is acquired by prescription, the purpose for which the easement may be used is limited by the user under which the easement was acquired. . . . "

In 19 C. J. p. 966, sec. 200, it is stated:

" . . . All easements are limited to the very purpose for which they were created, and their enjoyment cannot be extended by implication. . . . "

At p. 967, sec. 201, it is said:

"Where an easement is acquired by prescription, the extent of the right is fixed and determined by the user in which 'it originated, or, as it is sometimes expressed, by the claim of the party using the easement and the acquiescence of the owner of the servient tenement. . . . "

In the instant case the flowage rights acquired by prescription and the original dam were for the purpose of creating water power to operate a mill or mills on the old dam site. It is conceded that the dam constructed by defendant city in 1938 was for the purpose of "extending and enhancing the beauty of the public parks, parkways, and pleasure drives of the city of New Lisbon and to create as a part thereof a pond and artificial lake to be used solely for recreational and con-

servational purposes, which pond and artificial lake is to be created by constructing a dam across the large Lemonweir river, . . . approximately at the old dam site." Neither the Mauston Electric Service Company nor the Wisconsin Power & Light Company had any prescriptive right to construct and maintain a dam for the purposes for which the city constructed its dam. By their respective conveyances the Mauston Electric Service Company and the Wisconsin Power & Light Company have, as a matter of law, abandoned any right they might have had, by prescription or otherwise, to construct and maintain a milldam in place of the old milldam washed out in 1906 or 1907. Therefore, the city, under its deed from the Wisconsin Power & Light Company, acquired no right to construct and maintain the dam it built in 1938 for the purposes stated.

*By the Court.*—Motion denied.

FAIRCHILD, J. (*dissenting.*) The city claims by virtue of purchase a right its predecessors acquired by prescription. The trial court gave judgment against the city, holding that the right had been lost by nonuse for twenty years. It assumed that nonuse of an easement gained by prescription was thus extinguished. This court, in denying the motion for rehearing, disapproves of the doctrine followed by the trial court and affirms the judgment on an entirely different ground. The opinion states as a matter of law that "the flowage rights acquired by prescription and the original dam were for the purpose of creating water power to operate a mill or mills on the old dam site." And since the dam constructed by the city in 1938 was not for the purpose of operating a mill but for the purpose of extending the public parks and enhancing their beauty, it did not have an easement to flow respondent's lands.

Although it is true that no right acquired by prescription may exceed the extent of the use or original burden, still the

extent of a use of land for flowage purposes must be determined by the extent of the land flowed and the burden imposed upon the servient tenement—not by the purposes for which the use is exercised. Why may not the purpose be changed if in so doing no greater burden than the right which was acquired by prescription is imposed upon the servient tenement? In Angell, Watercourses, sec. 383, it is said: " . . . It has long been held that where one has acquired a right to raise and maintain a head of water by using it for one purpose, he may use it for another; he may, for instance, substitute a cotton factory for a sawmill and the like. . . ."

The cases cited in the opinion on motion for rehearing all involve a change in use of the easement which had an effect upon the servient estate. In the case at bar, there is no jury finding as to whether the flowage of the land by the dam built by the city materially increased the burden of the servient tenement. That is an issue which the city ought to be permitted to litigate in the trial court.

In *McWhorter v. Clarksburg* (1931), 111 W. Va. 9, 14, 161 S. E. 577, the city claimed an easement to flow lands in order to maintain a dam in connection with the running of a gristmill. The city later discontinued the mill but continued to maintain the dam and flow the lands, in order to store water for municipal purposes. The court said: "We are of opinion that the maintenance of the original dam for the statutory period for mill purposes entitled the millowners and their successors to continue its use for general purposes to the extent that the servitude of the riparian lands was not thereby increased." See also 2 Farnham, Waters and Water Courses, p. 1756, sec. 542.

Under the circumstances, I think the motion for a rehearing should have been granted.