**WISCONSIN VALLEY IMPROVEMENT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**United States Department of the Interior and Department of Agriculture, Intervenors.**

**Nos. 97–1557 & 99–1511.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 1, 2000.

Decided Jan. 26, 2001.

Naikang Tsao argued the cause for petitioner. With him on the briefs were Michael D. Fischer and Bradley D. Jackson.

Larry D. Gasteiger, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the briefs was John H. Conway, Acting Solicitor.

Ronald M. Spritzer, Attorney, U.S. Department of Justice, argued the cause for intervenors. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, and John T. Stahr, Attorney.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Wisconsin Valley Improvement Company ("WVIC" or "the company") petitions for review of Federal Energy Regulatory Commission ("FERC") orders imposing conditions on its license to operate a hydropower project. In addition to charging WVIC an annual fee for "use" of submerged federal lands, the licensing order requires petitioner to implement a "wild rice enhancement plan." FERC imposed the latter condition at the instance of intervenors United States Forest Service and Department of the Interior ("the agencies"), which hold federal lands overflowed by WVIC's reservoir. Petitioner argues, *inter alia*, that the conditions imposed exceed the scope of FERC's authority under the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.* (1994), as they govern areas that are not part of any "reservations" of the United States. Petitioner further argues that the enhancement plan is arbitrary and capricious as the required reduction in reservoir's water level would not result in wild rice growth, and challenges the requirement that it pay fees for its "use" of the submerged agency land. We conclude that FERC lawfully could require the wild rice implementation plan under the FPA and further, since it is impossible to confine reductions in the water level to federally controlled land, that FERC was entitled to impose water-level conditions on the entire project. We further hold that the agencies' decisions concerning the wild rice plan were not arbitrary and capricious, but that FERC's decision to charge annual fees was.

## I. BACKGROUND

Subchapter I of the FPA, 16 U.S.C. §§ 791a–823a (1994), confers on FERC the authority to award licenses for the operation of hydropower projects on the navigable waters of the United States. In particular, FPA § 4(e) requires FERC to include in licenses for projects that operate "within" a "reservation" of the United States, any "such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation." *Id.* § 797(e). That is, if a FERC-licensed project is located "within" an agency-supervised "reservation," that agency may require FERC to impose conditions on the manner in which the licensee may operate it. The FPA further defines "reservation" to include "national forests, tribal lands embraced within Indian reservations, military reservations, *and other lands and*

*interests in lands* owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also *lands and interests in lands* acquired and held for any public purposes; but shall not include national monuments or national parks." *Id.* § 796(2) (emphases added).

For the better part of a century, WVIC has operated a project—known as the Wisconsin River Headwaters System—consisting of dams and reservoirs on the Wisconsin and Tomahawk Rivers. WVIC was chartered by Wisconsin's legislature in 1907. In the same year, the company acquired the Lac Vieux Desert reservoir, a natural drainage lake on the Wisconsin–Michigan border that had been dammed for logging operations in 1870. Since 1907, WVIC has operated the reservoir and dam with the principal intent of producing hydroelectric power, as well as providing flood control. The company in 1937 replaced Lac Vieux Desert's nineteenth–century logging dam with a concrete reservoir dam. And in 1959, WVIC acquired from FERC's predecessor agency, the Federal Power Commission, a 50–year license for its project (the project was licensed in 1959, but its license was retroactive to 1943). At the time, the company was not charged fees for "using, enjoying, or occupying" the nearby federally owned lands that its reservoir overflowed.

WVIC sought to renew its license in 1991. During the relicensing proceedings, the agencies submitted to FERC, pursuant to FPA § 4(e), a number of conditions that would restrict the manner in which WVIC could operate its project. Those conditions were appropriate, the agencies explained, because WVIC's reservoir overflows 617.3 acres of the Nicolet and Ottawa National Forests, under the Forest Service's jurisdiction, and one-half acre of the Lac Vieux Desert Indian Reservation, administered by the Interior Department. *See Wisconsin Valley Improvement Co.,* 80 FERC ¶ 61,054, 61,170 (1997). After administrative hearings over a five-year period, FERC on July 18, 1996 issued an order that granted WVIC's license applica-

tion and included the agencies' proposed conditions, three of which the company now challenges. *See Wisconsin Valley Improvement Co.,* 76 FERC ¶ 61,050 (1996).

First, and most important, is Article 114, which requires WVIC to implement at Lac Vieux Desert what FERC styles a ten-year "wild rice enhancement plan." The company is obliged to reduce the reservoir's maximum water level by about nine inches, and to contribute $200,000 toward the planting and monitoring of wild rice. *See id.* at 61,257–59. The agencies asserted that their "wild rice enhancement plan" was necessary to reverse the depletion of wild rice at the reservoir. Although rice had once been abundant at Lac Vieux Desert, they explained, it had almost completely disappeared by the 1950s. The agencies attributed that decline to the high water that resulted when WVIC rebuilt the reservoir's dam in 1937, and correspondingly concluded that decreasing the reservoir's water level would create conditions favorable to the self-sustaining growth of wild rice. *See* Final Environmental Impact Statement at 3–37, 4–74 to 4–76, app. J (June 1996). WVIC estimates that, in addition to the $200,000 rice expenditure, it will suffer $400,000 in lost hydropower revenues over the ten-year period. *See* Petitioner's brief at 54; WVIC Response to Draft Environmental Impact Statement at 5–3 to 5–4 (April 13, 1995).

In addition, FERC included in WVIC's new license two provisions—Articles 201 and 202—that require the company to pay annual fees to the United States for its use of submerged federally-owned land. *See Wisconsin Valley Improvement Co.,* 76 FERC at 61,237. Such payments are required, FERC submits, by FPA § 10(e), which obliges a licensee to "pay to the United States reasonable annual charges in an amount to be fixed by the Commission ... for recompensing it for the use, occupancy, and enjoyment of its lands or other property." 16 U.S.C. § 803(e) (1994).

WVIC sought an administrative rehearing and petitioned for review in this Court. Although FERC subsequently issued several orders that modified its initial 1996 ruling, *see Wisconsin Valley Improvement Co.*, 80 FERC ¶ 61,054 (1997); *Wisconsin Valley Improvement Co.*, 87 FERC ¶ 62,-251 (1999); *Wisconsin Valley Improvement Co.*, 89 FERC ¶ 61,057 (1999), it left intact the portions challenged here. WVIC's first petition for review, case number 97–1557, was consolidated with its present petition by a January 10, 2000 order of this Court.

## II. DISCUSSION

### A. FPA § 4(e)

This Court reviews FERC's orders—including conditions prescribed by agencies pursuant to FPA § 4(e)—under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1994), which obliges us to reverse any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *see Sithe/Independence Power Partners v. FERC,* 165 F.3d 944, 948 (D.C.Cir.1999). As pertinent here, the APA's prohibition on arbitrary and capricious agency action requires us to decide whether FERC correctly concluded that the lands flooded by WVIC's reservoir are part of a "reservation" of the United States within the meaning of the FPA.

### 1. Existence of § 4(e) authority

WVIC argues that FERC cannot impose the conditions submitted by the agencies under § 4(e) as the facts of the present licensing procedure do not come within the rationale of that section. As petitioner views it, the mandatory conditioning authority under that section, giving as it does carte blanche authority to impose conditions on projects located within federal reservations, *see Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), could not have been intended to provide that sort of authority to otherwise uninvolved agencies over the regulation of

license projects no more connected to reservation land than WVIC is to the lands under consideration. WVIC argues that its project cannot be "within" the relevant reservations because "[t]he Agencies have no protectable property interests that conflict with WVIC's prescriptive water rights, and its operation of the Reservoir does not depend on the use or occupancy of any federal property right." Petitioner's brief at 11. That is a non sequitur.

The question whether WVIC owns flowage easements over the lands is irrelevant to whether the lands themselves are part of a federal reservation. As we stated above, the FPA defines the term "reservation" to include "national forest, tribal lands embraced within Indian reservations, military reservations, *and other lands and interests in lands* owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also *lands and interests in lands* acquired and held for any public purposes; ... not includ[ing] national monuments or national parks." 16 U.S.C. § 796(2) (emphases added). By the terms of the statute, the United States need not even hold land in fee simple absolute for it to operate a "reservation." It is enough that the government own an *"interest"* in the land. *See Escondido,* 466 U.S. at 781, 104 S.Ct. 2105 ("There is no doubt that 'reservations' include 'interests in lands owned by the United States....' "). And on the record before us, there can be no dispute that the United States owns at least an "interest" in the lands flooded by WVIC's reservoir, perhaps even the fee simple, whether or not subject to a prescriptive easement by WVIC.

Indeed, FERC consistently has affirmed its jurisdiction over land that the federal government owns subject to a citizen's easement. In *South Carolina Elec. & Gas Co.,* 75 FERC ¶ 61,308 n. 9 (1996), FERC reasoned that "even if we assume that SCE&G holds the easements it describes, that fact does not make the land in ques-

tion any less a reservation for purposes of section 4(e) of the FPA," since "the term ['reservation'] is not limited to fee title." And in *Town of Estes Park*, 75 FERC ¶ 61,245 (1996), the Commission concluded that "if the federal government holds fee title to certain lands, the lands qualify as lands owned by the United States for FPA purposes, even if someone else has a continuing right to use them pursuant to an easement."

But while the question of whether WVIC holds flowage easements is immaterial to the lands' status as federal "reservations," it remains quite relevant to the possibility that FERC's licensing order has "taken" the company's property in violation of the Fifth Amendment. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use without just compensation."). If WVIC does indeed own easements to flow the agencies' lands, and if FERC's order has prevented it from using its property rights, the government may well have affected an unconstitutional taking. *See National Wildlife Federation v. ICC*, 850 F.2d 694, 703 (D.C.Cir.1988) (recognizing that property rights in easements "do implicate the takings clause"); *cf. Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987):

> Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach ... we have no doubt there would have been a taking. To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather ... "a mere restriction on its use," is to use words in a manner that deprives them of all their ordinary meaning.

(citation omitted).

Both FERC and the agencies deny that WVIC has any cognizable property interest in the flooded lands, and repeatedly insist that the company has not demonstrated that it owns any *recorded* easements. Quite the contrary, they point out, for the government has introduced evidence that "only 7.63% of the total quantified National Forest System land within the Project is burdened with *recorded* flowage rights." Intervenors' brief at 14 n.5 (emphasis added); *see also* Respondent's brief at 16.

Of course, formal recordation is only one way—not, crucially, the exclusive way—by which a party in Wisconsin or Michigan may establish a flowage easement. Rather, both jurisdictions recognize that one may obtain an easement to flow water over another's land through *prescription. See, e.g., Chippewa & Flambeau Improvement Co. v. R.R. Comm'n*, 164 Wis. 105, 159 N.W. 739, 745 (1916); *Cook v. Grand River Hydroelectric Power Co.*, 131 Mich.App. 821, 346 N.W.2d 881, 884 (1984). WVIC's inability to point to recorded flowage easements is hardly the "fatal flaw" FERC takes it to be. Respondent's brief at 20.

■ But while WVIC may be able to advance a colorable Takings–Clause claim, it is not within our jurisdiction to adjudicate it. It is fixed law that, "[i]f there is a taking, and a claim for just compensation, then that is a Tucker Act matter to be pursued in the Court of Federal Claims, and not before us." *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 690 (D.C.Cir.2000). So far as the underlying questions of which property interests are owned by which parties, neither FERC nor this Court have jurisdiction to try title. Either the state courts or the United States District Court of appropriate jurisdiction acting pursuant to the Quiet Title Act, 28 U.S.C. § 2409a (1994), could adjudicate the factual questions such as whether WVIC's operations have been sufficient to give rise to prescriptive easements, and apply the appropriate law. If WVIC proves successful in its title actions, it could potentially pursue a takings claim in the Court of Federal Claims, which has exclusive jurisdiction over such actions. 28 U.S.C. § 1491 (1994). None of this, however, prevents either FERC or this

Court on review from applying the conditions sought by the affected agencies. We therefore cannot grant a petition for review on that basis.

### 2. Scope of § 4(e) authority

Slightly more complicated than *whether* FERC has authority under § 4(e) to impose license conditions, is the *extent* of that authority. The parties dispute whether the FPA—under which FERC must attach license conditions to projects located *"within* any reservation" of the United States, 16 U.S.C. § 797(e) (1994) (emphasis added)—permits FERC to prescribe conditions with respect to the entire Lac Vieux Desert project, or only as to those portions of the project that actually occupy reservation lands. The agencies propose that the government's "section 4(e) conditioning authority applies to the license, and therefore to all of the project works covered by that license, so long as . . . *part* of the licensed project is within the reservation." Intervenors' brief at 18 (emphasis added). WVIC responds with what it supposes is *a reductio ad absurdum*, and points out that the agencies' interpretation would permit FERC to impose project-wide license conditions "if any portion of the project touches a reservation (even if the overlap is the size of a postage stamp)."

■ We need not, however, decide the precise scope of the government's power to prescribe conditions for projects located "within" reservations. Rather, we resolve this issue on the narrow ground that on the facts of this case it would be impossible to attach a condition as to the reservation lands without simultaneously imposing it with respect to the entire project. As FERC points out, there simply is no way to require WVIC to reduce the water level of Lac Vieux Desert only over federal lands. A lake can have only one level. *See* Respondent's brief at 32 n.8 ("As the condition imposes maximum water levels on the entire project reservoir, it is unclear how WVIC could be required to limit the maximum water level on only those portions of the project reservoir occupying

the reservations, without affecting the water level throughout the project reservoir."). WVIC does not dispute that FERC could not reduce the level of the water that overflows the reservation lands without lowering the entire reservoir, and we therefore find that its order requiring WVIC to do so was not arbitrary and capricious.

Besides requiring WVIC to reduce the water level at Lac Vieux Desert, FERC's "wild rice enhancement plan" further calls for the company to fund the agencies' efforts to plant wild rice. Unlike changes in water level, it is possible to confine rice-planting to the federally owned reservations. Hence the rationale that permits the reduction of the reservoir's water level over non-reservation lands—that the government cannot lower the water over reservation lands without doing so as to the entire reservoir—would not justify a requirement that rice be planted on non-reservation lands. But it appears that the agencies have imposed no such condition. FERC's order calls for rice to be planted, not throughout the Lac Vieux Desert reservoir, but only on reservation lands—for example at Misery Bay and the suitably-named Rice Bay, both of which are on Forest Service or Indian Reservation land. *See* Final Environmental Impact Statement at 4–76 to 4–77 (June 1996). "In any event," FERC explains, "it is clear that the planned wild rice seeding is to occur on both the Indian and Forest Service reservations," and FERC has given no indication that it will require the planting of rice on non-reservation lands. *Wisconsin Valley Improvement Co.*, 76 FERC ¶ 61,050, 61,227 (1996).

### 3. Conclusion

In sum, FERC has the authority to attach conditions to WVIC's license to operate a project at Lac Vieux Desert, because the agencies own at least an "interest" in the lands flowed by the reservoir. The lands therefore are part of a "reservation" within the meaning of FPA § 4(e).

FERC's § 4(e) authority extends to areas outside the reservation's geographic boundaries, because it is impossible to lower the water level over the federal lands without reducing the entire reservoir.

### B. The "wild rice enhancement plan"

■ We review FERC and the agencies' decision to require that WVIC undertake a "wild rice enhancement plan" under the APA's arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(2)(A) (1994). A party seeking to have a court declare an agency action to be arbitrary and capricious carries "a heavy burden indeed." *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 714 (D.C.Cir.2000). We will not substitute our own judgment for that of the agency, but will examine only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), whether the agency's policy choice is supported by "substantial evidence," and "whether there is a rational connection between the facts and the choice made." *Bangor Hydro–Electric Co. v. FERC*, 78 F.3d 659, 663 n. 3 (D.C.Cir.1996).

At first blush, this case seemingly requires that we review two distinct actions: first, the agencies' conclusion that the "wild rice enhancement plan" would lead to the revitalization of wild rice at Lac Vieux Desert; and second, FERC's decision to include that condition in WVIC's project license. In fact only the agencies' action is relevant to our inquiry. FPA § 4(e) *obliges* FERC to include the conditions that are prescribed by agencies that have jurisdiction over reservation lands: Project licenses "*shall* be subject to and contain such conditions as" the agencies deem necessary. 16 U.S.C. § 797(e) (1994) (emphasis added). FERC has no discretion to decide whether or not to include a proposed condition in a project license; if an agency proposes a condition, FERC must include it. The Commission was not acting arbitrarily and capriciously

when it included the agencies' wild-rice condition; it simply was following the law.

■ Therefore, we review only the underlying decision of the agencies, and in that analysis must determine whether it was arbitrary and capricious for the agencies to conclude that (1) high water levels were responsible for the decline of wild rice at Lac Vieux Desert; (2) WVIC's 1937 construction of a reservoir dam caused those high water levels; (3) a reduction in water level will create conditions favorable to selfsustaining wild rice growth; and (4) the use of "detritus mats" would be an effective way of reintroducing wild rice to the reservoir. We conclude—given "the very limited scope of our review," *Transmission Access*, 225 F.3d at 713—that the evidence before the agencies adequately supports each of their four conclusions.

First, the agencies' conclusion that an increase in Lac Vieux Desert's water depth was responsible for the decline in wild rice was not arbitrary and capricious. The agencies concede that a number of factors influence the success of wild rice, but point to abundant evidence indicating that water depth is the most important. To be sure, their experts appear to disagree on just how deep water threatens rice growth: one suggests that deep water does not allow enough sunlight to penetrate for photosynthesis to occur, while another proposes that deep water drowns the rice. But the crucial point is that the agencies have based their policy choice on substantial evidence.

Relatedly, it was not arbitrary and capricious for the agencies to conclude that WVIC's 1937 construction of a reservoir dam—which replaced a nineteenth-century logging dam—was responsible for so increasing the lake's depth as to kill off the then-extant wild rice. WVIC correctly points out that Lac Vieux Desert had been dammed for some 60 years before the rice began to decline in the 1940s. But it wrongly insinuates that, because wild rice thrived alongside the logging dam, the new dam cannot have been responsible for rice-

killing high water. That argument fails to take account of the crucial difference between logging dams and reservoir dams: While WVIC's reservoir dam maintains water depth at a constant level, the logging dam was used to build up a head of water that, when released, drove accumulated logs downstream. As Wisconsin's Supreme Court has explained:

> A log-driving dam is not built for storage purposes or for keeping a constant head of water during the year, but for the raising of a head of water in the early spring and immediately using such water in successive rapid miniature floods during the spring months. The reservoir dam is built for the purpose of storing up a great quantity of water during the spring and conserving it for gradual depletion during the summer season. In the one case the normal situation is that the dam is empty at the beginning of the summer and so remains, while in the other case it is full at the beginning of the summer and remains so subject only to slow reduction when it becomes necessary to supplement the natural flow of the river which has become lessened by long-continued dry weather.

*Chippewa & Flambeau Improvement Co. v. R.R. Comm'n,* 164 Wis. 105, 159 N.W. 739, 745 (1916). In fact, the two types of dams "are practically the antitheses of each other." *Id.*

As the agencies point out, because the logging dam would have been opened in the spring, Lac Vieux Desert would have returned to its normal depth by June and July, just in time for the crucial "floating leaf stage" of wild rice growth. *See* Intervenors' brief at 35–36. The nineteenth-century reservoir dam would not have produced the consistent flooding the agencies propose was responsible for destroying Lac Vieux Desert's rice crop. It therefore was eminently reasonable for them to conclude that WVIC's reservoir dam produced the high water that in turn caused the decline in wild rice, even though WVIC's old logging dam resulted in no similar reduction.

Third, the agencies's conclusion that reducing Lac Vieux Desert's water level will enable the reservoir once again to sustain wild rice was not arbitrary and capricious. If high water is the principal factor inhibiting the growth of wild rice, it follows that reducing the reservoir's depth will create conditions more favorable to rice growth. WVIC attempts to cast doubt on the agencies' conclusion by pointing to another factor that, it submits, would continue to inhibit rice even if it is made to reduce the reservoir's water level. The company proposes that Lac Vieux Desert will remain inhospitable to wild rice due to the continued presence of highly flocculent sediments which, it argues, will expose fragile rice shoots to destructive wind and wave action. But the company cannot explain why the reservoir's sediments did not inhibit rice growth before the 1940s. In addition, the agencies have introduced evidence demonstrating other highly flocculent lakes—including the Pat Shay and Kaine lakes—have been reseeded successfully.

Finally, it was not arbitrary and capricious for the agencies to conclude that the use of artificial "detritus mats"—layers of floating vegetative residue on which, it is supposed, rice can grow—would be an effective way of reintroducing wild rice to Lac Vieux Desert. WVIC has introduced evidence from a scientific expert that such detritus mats simply do not exist. The foundational assumption of the detritus-mat theory, WVIC's expert explained, is that several years' worth of undecomposed straw would amass on the lake's surface and provide a bed for rice growth. But it would be impossible for vegetative detritus to accumulate given that "[m]ost of this straw is swept to shore before germination of the seed the next spring."

Given the presence of disputing expert witnesses, this controversy parallels one described by the Supreme Court as "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376,

109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). We in this case, as the Supreme Court in that one, "must defer to 'the informed discretion of the responsible federal agencies.'" *Id.* at 377, 109 S.Ct. 1851 (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). Like the Supreme Court in *Marsh,* we hold that the agency's decision concerning the evidence before it "involves primarily issues of fact." *Id.* Accordingly, we hold that that decision was not arbitrary and capricious, and we cannot set it aside.

Here, the agencies had before them evidence that 10–14 inch-thick layers of vegetative detritus have been discovered on the bed of the Wisconsin River. It may be true, as WVIC argues, that because the detritus was found submerged on the river's bed, and not on its surface, it would be unlikely to support rice growth. If we were to decide the question as an original matter, we might well agree. But it is not our role to engage in the *de novo* weighing of evidence. As we recently emphasized, "[i]t is not enough for petitioners to convince us of the reasonableness of their views; ... those arguments should be presented to FERC, whose commissioners are appointed by the President and confirmed by the Senate with the expectation that they, not Article III courts, will make policy judgments." *Transmission Access Policy Study Group v. FERC,* 225 F.3d 667, 714 (D.C.Cir.2000). The agencies here have based their policy choice on substantial scientific evidence and that is enough to survive arbitrary–and-capricious review, whatever may be this Court's views as to the persuasiveness of that evidence.

In sum, because the agencies have relied upon sufficient expert evidence to establish "a rational connection between the facts and the choice made," *Bangor Hydro–Electric Co. v. FERC,* 78 F.3d 659, 663 n. 3 (D.C.Cir.1996), it was not arbitrary and capricious for them to require WVIC to undertake a "wild rice enhancement plan." To be sure, WVIC has submitted evidence that casts some doubt on the soundness of the agencies' conclusions. But as the Supreme Court emphasized in *Marsh,* we are not called upon to weigh competing experts' opinions "as an original matter." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. We only inquire whether the agencies have based their policy choices on reasonable expert evidence. They have done so here.

C.   Usage fees under FPA § 10(e)

In addition to obliging WVIC to implement a "wild rice enhancement plan" pursuant to FPA § 4(e), FERC's order also charges the company annual fees for its "use" of the reservation lands flooded by its reservoir. *See Wisconsin Valley Improvement Co.,* 76 FERC at 61,237. FERC imposed that condition pursuant to FPA § 10(e), which establishes that a "licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States ... for the use, occupancy, and enjoyment of its lands or other property." 16 U.S.C. § 803(e) (1994). WVIC challenges the usage-fee condition by claiming that it does not, in fact, "use, occupy, or enjoy" any federal property, since it holds easements entitling it to flow water over the agencies' lands—and, indeed, acquired those easements many years before the agencies came to own the burdened land. In essence, the company attempts to defeat the § 10(e) conditions with the same argument it advanced against the § 4(e) conditions.

Though, as we already have explained, the issue whether WVIC owns rights to flow water over the agencies' lands is immaterial to the lands' status as federal "reservations," it remains relevant to the subsequent question of whether the agencies may impose annual charges for the company's use of federal lands pursuant to FPA § 10(e). And, again as we have already explained, WVIC has not yet demonstrated that it has flooded the agencies' lands pursuant to its own flowage easements. However, WVIC's failure conclusively to establish that it owns the asserted easements does not end our inquiry. This Court must further determine whether the

agencies have proffered a satisfactory explanation for now deciding to assess § 10(e) usage fees, given that WVIC's old license included no such charges.

■ Section 706(2)(A) of the APA requires agencies to, among other things, "consider the relevant factors and draw a rational connection between the facts found and the choice made." *Missouri Public Serv. Comm'n v. FERC*, 215 F.3d 1, 3 (D.C.Cir.2000) (citation and quotation marks omitted). In particular, an agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so. "Indeed, where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C.Cir.1995); *see also AT&T v. FCC*, 974 F.2d 1351, 1355 (D.C.Cir.1992) (faulting the FCC for failing to explain why it "changed the original price cap rules" and concluding that the Commission's *"Reconsideration Order* is arbitrary and capricious for want of an adequate explanation"). As the Supreme Court has put it, "an agency changing its course must supply a reasoned analysis . . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted).

■ The requirements imposed by FERC's order mark a sharp departure from WVIC's 1959 license, which contained no obligation to reimburse the federal government for flooding its lands. In its 1959 licensing order, the Commission found that the company's project occupied lands of the United States. *See Wisconsin Valley Improvement Co.*, 21 F.P.C. 785, 788, 1959 WL 3347 (1959). It concluded, however, that it could not impose usage fees until then-ongoing land studies revealed the extent of the United States' property rights. *See id.* ("However, land studies, now in progress, must be completed before we can make a final determination as to the amount of lands of the United States occu-

pied by the project and as to the amount of annual charges due the United States for the use, occupancy and enjoyment of such lands.").

FERC no longer holds that it may impose user fees only after a land study establishes the extent of the United States' property interests. Its new position is that it may charge such fees "unless and until [WVIC's property] rights are confirmed by an appropriate state or federal authority." *Wisconsin Valley Improvement Co.*, 80 FERC ¶ 61,054, 61,174 (1997). Whereas the United States formerly bore the burden of establishing that WVIC "used, occupied, or enjoyed" various of its property interests, FERC's new license places the burden on the company to demonstrate that it does not use the government's land. FERC has offered no explanation—far less a "reasoned" one—for this abrupt departure. Because it has failed to do so, we find that FERC's sudden imposition of usage fees under FPA § 10(e) was arbitrary and capricious.

We therefore grant WVIC's petition for review, in part, and remand to FERC with instructions that the Commission remove the usage-fee provisions from the company's project license.

## III. CONCLUSION

With one exception, we uphold FERC's licensing orders. FPA § 4(e) authorized FERC to attach "wild rice enhancement" conditions to WVIC's project license because the United States owned at least an "interest" in the flooded lands. FERC further was entitled to impose those conditions with respect to the entire project, as it would be impossible to reduce the reservoir's water level over just the federally controlled land. The agencies reasonably concluded that a reduction in the reservoir's water level would allow wild rice again to flourish. However, it was arbitrary and capricious for FERC to begin charging WVIC fees for "using, occupying, and enjoying" submerged federal lands, without providing any explanation for its

sudden change in policy. The petition for review is granted in part and denied in part, and we remand to FERC so that it may eliminate the usage-fees requirement from WVIC's project license.

*It is so ordered.*