PAN–ALBERTA GAS, LTD. and
Pan–Alberta Gas (U.S.)
Inc., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Southwest Gas Corporation, Intervenor.

No. 00–1005.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 2, 2001.

Decided June 1, 2001.

John R. Staffier argued the cause for petitioner. With him on the brief was Marisa A. Sifontes.

Dennis Lane, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were John H. Conway, Deputy Solicitor, Timm L. Abendroth and Monique L. Penn–Jenkins, Attorneys.

Alex A. Goldberg argued the cause for amicus curiae Northwest Pipeline Corpo-

ration. With him on the brief were Steven W. Snarr and Tim W. Muller.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Pan–Alberta Gas, Ltd. and an affiliate petition for review of orders of the Federal Energy Regulatory Commission authorizing Northwest Pipeline Corporation to add capacity to its natural gas pipeline and to sell that capacity to Duke Trading and Marketing, LLC and its affiliate. Pan–Alberta argues that the orders are not based upon substantial evidence in the record, arbitrary and capricious, and contrary to both Commission policies and Northwest's tariff. Because each of these arguments lacks merit, we deny Pan–Alberta's petition.

## I. Background

In 1999 the Commission granted Northwest a certificate of public convenience and necessity authorizing the company to expand by 50,000 dekatherms per day ("Dth/d") the physical capacity of a segment of its natural gas pipeline in Oregon and Washington. *Northwest Pipeline Corp.*, 87 F.E.R.C. ¶ 61,227 at 61,914, 1999 WL 339353 (1999) ("*Order*"); *see also Northwest Pipeline Corp.*, 89 F.E.R.C. ¶ 61,172, 1999 WL 1025484 (1999) ("*Rehearing Order*" denying Pan–Alberta's requests for rehearing and clarification of the *Order*). The Commission also approved Northwest's sale of this new capacity to Duke, which agreed to pay Northwest an annual "reservation Facility Charge" that "would compensate Northwest for the incremental cost-of-service attributable to the additional facilities." *Order* at 61,915. In addition, the Commission approved Duke's and Northwest's agreement to amend 19 existing contracts. Those contracts, which in the aggregate provided firm capacity for the transport of 50,000 Dth/d of gas between two points in Colorado, would be amended to provide instead (with no change in financial terms) for transport between points in Oregon and in Washington. *Order* at 61,914. Duke's total payments to Northwest for the Washington–Oregon capacity would thus consist of two elements: the charge for the capacity itself, as provided in the 19 amended contracts (and sometimes called the "reservation charge," *see, e.g.*, 18 C.F.R. § 284.7(e); *Order* at 61,918), plus the newly agreed upon "reservation Facility charge," *see Order* at 61,915.

The 19 contracts involved in this transaction arose out of Duke's application of the "capacity release/segmentation process" to what had been a single contract between Duke and Northwest for 40,000 Dth/d of firm capacity along a segment of Northwest's pipeline in Colorado. *Rehearing Order* at 61,521 n.2, 61,523; *accord Order* at 61,914 & n. 5. Both "capacity release" and "segmentation" require some explanation.

"Capacity release" describes a transaction in which the holder of a contract for firm transport (the "releasing" shipper) sells that capacity to a "replacement" shipper. The releasing and replacement shippers may agree upon any price up to the applicable reservation charge—the maximum price per unit of firm capacity established in the pipeline's tariff. A shipper seeking to release capacity may either auction it to the highest bidder on a public bulletin board maintained by the pipeline or bypass the auction to contract at the reservation charge with a replacement shipper of its choosing. *See* 18 C.F.R. § 284.8(a)-(e). Once a deal to release ca-

pacity has been struck, the replacement shipper pays the agreed-upon price not to the releasing shipper but to the pipeline, with which it enters into a new capacity contract. The pipeline then credits payments received from the replacement shipper to the account of the releasing shipper; and the releasing shipper continues to pay the price stated in the original contract, which remains in force. *See id.* § 284.8(f). The pipeline therefore gains nothing from a capacity release transaction; its income is fixed at the price originally agreed upon with the releasing shipper, regardless of the terms of the capacity release agreement.

"Segmentation" describes a transaction in which an owner of firm capacity sells that capacity piecemeal. To use the Commission's example, a shipper that owns the right to transport 10,000 Dth/d between the Gulf of Mexico and New York City could release to one replacement shipper the right to transport 10,000 Dth/d from the Gulf to Atlanta, and release to another replacement shipper the right to transport 10,000 Dth/d from Atlanta to New York. *See Pipeline Service Obligations, and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, Order 636–B*, 61 F.E.R.C. ¶61,272 at 61,997, 1992 WL 509683 (1992). Because Northwest charges a "postage stamp" rate—that is, a shipper purchasing capacity at the reservation charge pays the same price to ship gas across the country as it does to ship gas across town, *see Northwest Pipeline Corp.*, 82 F.E.R.C. ¶ 61,158 at 61,576, 1998 WL 61985 (1998)—a shipper that resells its capacity in segments can realize multiples of what it paid for that capacity.

An owner of firm capacity also has the right under the Commission's regulations to change the specified segment of the pipeline along which that capacity is to be provided (the so-called "service path"); for example, in this case Duke, the owner of firm capacity for the transport of gas between two points in Colorado, sought to amend its contract to provide instead for the same amount of capacity between Oregon and Washington. *See Rehearing Order* at 61,523. Because capacity is sold at a postage stamp rate, such an amendment does not entail a change in the price paid by the shipper. Like a segmentation transaction, a change in service path is limited by the operational constraints of the pipeline, *see* 18 C.F.R. § 284.7(d). Because the Northwest pipeline is bidirectional, however, the net effect of all existing gas flows on the pipeline (so-called net "displacement") may enable a shipper to introduce gas into and remove gas from the pipeline at newly designated points without Northwest having the physical capacity for that gas to traverse the path between the two points. *See, e.g., Order* at 61,914.

With these techniques available to it, one can see how "a sequence of long-term, segmented releases, and subsequent receipt and delivery point amendments," *Northwest Application for Certificate of Public Convenience and Necessity,* FERC Docket No. CP–96–554, at 9 (May 1998), could enable Duke, without increasing its total payments to Northwest, to convert its original contract for 40,000 Dth/d of capacity into multiple contracts, including 19 or more contracts that in the aggregate provide it with firm capacity of 50,000 Dth/d or more. *See Order* at 61,914 n. 5. The release and replacement of segmented contracts allow a shipper to increase its total capacity under a firm transportation contract without incurring a price increase, and service path amendments permit a shipper to transform a short path into a long one that can be further segmented and the parts sold, thus creating what Northwest calls a "daisy chain" of transac-

tions. Indeed, the transaction approved in the *Order* is but the latest service path amendment in Duke's "daisy chain." Like its predecessors, this transaction does not affect the reservation charge Duke pays for its capacity, which remains fixed at the price in the original contract for 40,000 Dth/d. It differs from the others in the chain only in that Duke agreed to pay a facilities charge to Northwest in addition to the reservation charge.

Pan–Alberta registered various objections to this transaction before the Commission, *see Order* at 61,916, and upon issuance of the *Order* reiterated them in a request for rehearing and clarification, which the Commission denied. Pan–Alberta here seeks review of both the *Order* and the *Rehearing Order*, and Northwest appears as amicus curiae in support of the Commission.

## II. Analysis

Pan–Alberta argues that the Commission based its determination of the public convenience and necessity upon a misunderstanding of how much capacity Duke controlled on Northwest's pipeline. According to Pan–Alberta, the Commission lacked substantial evidence to support its conclusion that Duke had effective control over only 50,000 Dth/d of capacity, making the Commission's answer to the "fundamental question" of the extent of Duke's holdings "inherently arbitrary and capricious." *See Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 745 (D.C.Cir.2001) (agency decision is arbitrary and capricious if factual determinations lack substantial evidence). In the alternative, Pan–Alberta argues that the orders under review violate both Northwest's tariff and the Commission's policy regarding release and replacement.

The *Orders* are indeed less than pellucid about how much capacity Duke controls,

and the parties' briefs do nothing to clarify the situation. Particularly confusing is the Commission's failure in the *Orders*, and all the parties' failure in their briefs, unequivocally to state whether Duke's 19 contracts for 50,000 Dth/d of capacity are the sole progeny of the original 40,000 Dth/d contract between Northwest and Duke or whether they are but a subset of the contracts resulting from the "daisy chain" of transactions based upon the original agreement. This confusion is exacerbated by the Commission's statement in the *Rehearing Order* (at 61,523) that Duke

> has effectively transferred its contractual obligation for 40,000 Dth a day of capacity to the northern segment of Northwest's system [i.e., from Oregon to Washington]. This frees up 40,000 Dth a day of capacity on the southern segment [i.e., in Colorado].

In fact, the transfer "frees up" 50,000 Dth/d, not 40,000 Dth/d, of capacity on the southern segment. Pan–Alberta suggests this shows that the Commission mistakenly believed itself to be approving a transfer of the original 40,000 Dth/d of capacity at the root of the daisy chain rather than the 50,000 Dth/d that blossomed from it, or at least that the Commission was confused regarding the amount of capacity at issue. The Commission insists that it fully understood the transaction, but concedes in its brief that some confusion could have been avoided had it described the "transfer" in terms of the larger quantity.

■ We agree with the Commission that, notwithstanding their expository shortcomings, the *Orders* do enable one accurately to understand the transaction and do not show that the Commission misunderstood any material fact. The *Orders* make clear that Duke began with a single contract for 40,000 Dth/d of firm capacity, that it parlayed that contract into multiple contracts for a total of 50,000 Dth/d of

capacity, and that it sought in the subject transaction to amend the service path for that 50,000 Dth/d from one in Colorado to a route between Oregon and Washington, along a segment of the pipeline that Northwest had agreed to expand. *See Order* at 61,914 & n. 5. As the Commission points out, its above-quoted description of the transfer, although confusing, is entirely consistent with this understanding and in no way inaccurate: Duke has in fact "effectively transferred" its original 40,000 Dth/d contract to give it control over 50,000 Dth/d of capacity on "the northern segment of Northwest's system." *Rehearing Order* at 61,523.

Pan–Alberta suggested before the Commission that "Duke's capacity will increase [as a result of the *Order*] from the original 40,000 Dth a day under its original primary contracts to as much as 90,000 Dth a day (50,000 Dth a day of new capacity on the expansion facilities plus the original 40,000 Dth a day in Colorado)." *Id.* As Northwest explains, however, the 90,000 Dth/d figure is an artifact of the arrangement whereby the contract of a releasing shipper continues in force even as that shipper cedes effective control of its capacity to the replacement shipper. *See* above at 174. Duke, which is both the releasing and the replacement shipper in the disputed transaction, thus emerges from the *Order* with contracts for 90,000 Dth/d of capacity: as the replacement shipper it controls 50,000 Dth/d of capacity in the north, while as the releasing shipper it nominally maintains its original contract for 40,000 Dth/d of capacity in the south. Of course, by releasing its capacity Duke has ceded any right actually to ship gas along the Colorado service path; its 90,000 Dth/d of contracts notwithstanding, it effectively controls only 50,000 Dth/d of capacity. This account is again fully consistent with the *Orders*.

Indeed, because any release of capacity generates a new contract between the pipeline and the replacement shipper while leaving the releasing shipper's contract in force, a daisy chain of transactions necessarily creates a corresponding daisy chain of contracts. Depending upon the number of links in the chain, Duke may well be party to contracts that formally give it the rights to even more than 90,000 Dth/d of capacity, over much of which it has no effective control.

We also reject Pan–Alberta's claim that the total amount of capacity that Duke controls is a fact "fundamental" to whether the transaction at issue serves the public interest and necessity. As the Commission points out, the orders under review do not address let alone ratify the transactions by which Duke parlayed its 40,000 Dth/d of capacity into 50,000 Dth/d; they address only whether Duke and Northwest may "change the primary service path[]" for the 50,000 Dth/d of capacity that Duke had secured previously. *Order* at 61,914. Even if the daisy chain in fact yielded contracts that in the aggregate gave Duke effective (not just formal) control over more than 50,000 Dth/d of capacity, such additional capacity would be immaterial to the transaction now in suit. For the same reason, we do not consider Pan–Alberta's claim that the daisy chain of transactions by which Duke parlayed its 40,000 Dth/d into 50,000 Dth/d is inconsistent with the Commission's policy that "releasing and replacement shippers do not have a right to obtain more capacity than that which the releasing shipper initially held." *Transcontinental Gas Pipe Line Corp. (Transco)*, 89 F.E.R.C. ¶ 61,167 at 61,503, 1999 WL 1025481 (1999) (citing *Tennessee Gas Pipeline Co.*, 85 F.E.R.C. ¶ 61,052 at 61,163, 1998 WL 718398 (1998)). Because the daisy chain transactions were not at issue when the *Orders* were before

the Commission, Pan–Alberta may not challenge their validity in this case. *Cf. Southwest Gas Corp. v. FERC*, 145 F.3d 365, 370 (D.C.Cir.1998) ("The Commission need not revisit the reasoning of a general order every time it applies it to a specific circumstance").

Finally, Pan–Alberta claims that the arrangement under which Duke pays usage charges only on its original 40,000 Dth/d of capacity rather than on the 50,000 Dth/d violates the requirement of Northwest's tariff that the shipper pay a reservation charge for each Dth/d of capacity it controls. As the Commission notes, however, this requirement is satisfied because Duke makes payments on each of its two distinct contracts with Northwest — one as a releasing shipper with respect to 40,000 Dth/d, and one as a replacement shipper with respect to 50,000 Dth/d. *See Order* at 61,918. The tariff is not violated merely because the payments Duke makes on its replacement contract for 50,000 Dth/d are credited to its account in its role as releasing shipper. *See id.*

### III. Conclusion

For the foregoing reasons, the petition for review is

*Denied.*