# United States Court of Appeals
## For the First Circuit

―――――――――

Nos. 00-1909, 01-2025, 03-2055

JAMES M. KNOTT, SR.;
RIVERDALE POWER & ELECTRIC CO., INC.,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

―――――――――

PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

―――――――――

Before

Boudin, Chief Judge,

Lynch, Circuit Judge,

and Schwarzer,[*] Senior District Judge.

―――――――――

Jamy Buchanan Madeja, with whom Buchanan & Associates was on brief, for petitioners.
Robert H. Solomon, Deputy Solicitor, with whom Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor were on brief, for respondent.

―――――――――

October 25, 2004

―――――――――

―――――――――

[*]Of the Northern District of California, sitting by designation.

**SCHWARZER**, <u>**Senior District Judge**</u>.  James M. Knott, Sr. and the Riverdale Power & Electric Co. ("Knott") petition for review of three orders by the Federal Energy Regulatory Commission ("FERC").  The orders assert mandatory licensing authority over Knott's hydroelectric project, require him to install gages to measure stream flow at the project, and direct him to submit project design revisions on microfiche cards.  Knott alleges that FERC improperly asserted jurisdiction over the project, that the required compliance would effect a Fifth Amendment taking of his property, that FERC improperly denied him an evidentiary hearing, and that FERC unreasonably ordered gages and microfiche cards.  For the reasons stated, we deny Knott's petition for review.

## FACTUAL AND PROCEDURAL BACKGROUND

Originally built in the 19th century, Knott's Riverdale Mills Project ("Project") is located on the Blackstone River in Worcester County, Massachusetts.  The Project includes a 142-foot-long, 10-foot-high dam, an 11.8-acre water impoundment, and a 150-kilowatt generator located within a mill building.  Knott purchased the Project, which had been abandoned since 1976, in 1979.  Through a separate entity, the Riverdale Mills Corporation, Knott uses the hydropower generated by the Project to produce steel wire for use in lobster traps.

The Federal Power Act ("FPA"), 16 U.S.C. §§ 791a-825r, grants FERC two types of licensing authority over hydroelectric projects. Section 4(e) of the Act authorizes FERC to grant voluntary licenses for any project that develops power in any body of water over which Congress has Commerce Clause authority. 16 U.S.C. § 797(e). Section 23(b)(1) requires the mandatory licensing of projects: (1) located on "any of the navigable waters of the United States;" or (2) located on a body of water over which Congress has Commerce Clause authority where project construction occurred on or after August 26, 1935, and the project affects the interests of interstate or foreign commerce. 16 U.S.C. § 817(1).

In 1985, Knott applied for and received a voluntary license to operate the Project, subject to numerous conditions. Because Knott received a voluntary license, FERC had no occasion to determine whether it had mandatory licensing jurisdiction over the Project.

In early 1999 FERC received letters alleging extreme fluctuations in the Blackstone River below the Project and noted a concern by state agencies and conservation groups that the fluctuations might be the result of Knott's failure to operate his Project to allow a continuous stream flow. In a series of letters FERC repeatedly requested stream flow gaging records, and Knott repeatedly responded that he had no obligation to install stream flow gages. In December 1999 FERC issued a compliance order

requiring Knott to file a plan for installing stream flow gages at the Project, in accordance with Article 6 of Knott's license.[1] Knott filed a request for rehearing, which FERC denied on May 22, 2000.

In November 2000 Knott filed for FERC approval to install an unrelated "flood flow modular gate." FERC approved the proposal, but required Knott to file revised drawings of the gate on aperture cards (3 1/4" x 7") on silver or gelatin 35 mm microfilm. Knott sought rehearing of this requirement, which FERC denied. FERC noted that its regulations require exhibit drawings to be microfilmed onto aperture cards, that aperture cards provide an inexpensive and durable information medium, and that some of Knott's paper drawings were inaccurate. Knott timely petitioned for review.

During the course of his earlier proceedings, Knott contended that FERC had no jurisdiction over the Project and, thus, could not compel him to comply with either his license or agency regulations. In response, FERC instituted a proceeding to reexamine the basis for its jurisdiction. In November 2000 FERC staff prepared a supplemental study of the navigability of the Blackstone River. The study described in detail a four-day

_____

[1]The terms and conditions of the voluntary license provide that "[t]he Licensee shall install and thereafter maintain gages and stream-gaging stations for the purpose of determining the stage and flow of the stream or streams on which the project is located." App. 106.

expedition in September 2000, organized by local businesses, environmental groups, and governmental bodies, in which approximately thirty canoeists traversed the river from Worcester, past the Project, into Rhode Island and then Narragansett Bay. Based on this expedition, which was accomplished with a minimum of overland transport, or "portages," FERC staff concluded that the Blackstone River is suitable for interstate use by recreational boaters and is thus a navigable waterway within the meaning of FPA § 3(8). See 16 U.S.C. § 796(8) (defining "navigable waters"). FERC therefore concluded that the Project is subject to its mandatory licensing authority, and ordered Knott to abide by its orders and all license terms and conditions.

Knott filed a request for rehearing, which FERC denied. FERC upheld the finding of the staff navigability report and also found, as a separate basis for jurisdiction, that (1) the Blackstone River has an effect on interstate commerce; (2) the Project has an effect on interstate commerce; and (3) Project construction had occurred since August 1935 because Knott had substantially rebuilt Project facilities and returned them to operation after the Project had been abandoned in 1976. FERC additionally rejected Knott's takings and due process arguments. Knott timely petitioned for review.

**DISCUSSION**

## I.   STANDARD OF REVIEW

"We review FERC's findings of fact for 'substantial evidence,' and if so supported, such findings are conclusive." Thomas Hodgson & Sons v. FERC, 49 F.3d 822, 825 (1st Cir. 1995); 16 U.S.C. § 825l.  We "defer to the agency's expertise . . . so long as its decision is supported by 'substantial evidence' in the record and reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made."  Northeast Utils. Serv. Co. v. FERC, 993 F.2d 937, 944 (1st Cir. 1993) (citation omitted).

"'Pure' legal errors require no deference to agency expertise, and are reviewed de novo."  Id.  "Questions involving an interpretation of the FPA involve a de novo determination by the court of congressional intent; if that intent is ambiguous, FERC's conclusion will only be rejected if it is unreasonable."  Id. (citing Chevron USA v. Natural Res. Def. Council, 467 U.S. 837, 842-45 (1984)).

We review FERC orders under the Administrative Procedure Act, 5 U.S.C. § 551, and must reverse an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Wis. Valley Improvement Co. v. FERC, 236 F.3d 738, 742 (D.C. Cir. 2001).

## II.  MANDATORY JURISDICTION

Knott challenges both grounds upon which FERC based its finding of mandatory jurisdiction:  (1) that the Blackstone River is navigable; and (2) that Knott's reconstruction work after a period of abandonment sufficed to confer jurisdiction.  Because we hold that FERC properly based its jurisdiction on a finding of navigability, we do not reach the issues of abandonment and reconstruction.

The FPA, adopted in 1920, defines "navigable waters" as:

> [T]hose parts of streams or other bodies of water over which Congress has [Commerce Clause] jurisdiction . . . and which either in their natural or improved condition <u>notwithstanding interruptions</u> between the navigable parts of such streams or waters <u>by falls, shallows, or rapids compelling land carriage</u>, are used <u>or suitable for use</u> for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids.

16 U.S.C. § 796(8) (emphases added). Based on this definition, and case law interpreting it, FERC correctly found that the September 2000 canoe trip demonstrated that the Blackstone River and Project site were "suitable for use" in interstate commerce notwithstanding the shallows "compelling land carriage."

Knott first argues that FERC's authority must be limited to waterways used for actual, ongoing interstate commerce, "not hypothetical possibilities of unrealized commerce."  This argument is unavailing.  The statutory language applies to waters in use or

"suitable for use" for personal transportation, notwithstanding interruptions. Id. The Supreme Court has held that the absence of actual commercial traffic does not bar "a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation." United States v. Appalachian Elec. Power Co., 311 U.S. 377, 416 (1940); see also United States v. Utah, 283 U.S. 64, 82 (1931) ("The extent of existing commerce is not the test."). Irregular canoe trips may support a finding of navigability. See FPL Energy Me. Hydro LLC v. FERC, 287 F.3d 1151, 1157 (D.C. Cir. 2002) (upholding a determination of navigability based on three canoe trips made for the purpose of litigation).

Nor does the fact that the Blackstone River required portages defeat a finding of navigability. The statute explicitly contemplates that waterways may be navigable "notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage." 16 U.S.C. § 796(8). "Such interruptions do not render an otherwise navigable stream non-navigable." Consol. Hydro, Inc. v. FERC, 968 F.2d 1258, 1262 (D.C. Cir. 1992) (citing cases).[2]

---

[2]Knott's selective citations do not undermine these principles. Knott incorrectly relies on Miami Valley Conservancy Dist. v. Alexander, 692 F.2d 447 (6th Cir. 1982), a case challenging Army Corps of Engineers jurisdiction under the Rivers and Harbors Act of 1899, and LeBlanc v. Cleveland, 198 F.3d 353 (2nd Cir. 1999), a personal injury suit arising under general admiralty law. Neither case evaluated or applied FPA § 3(8).

Given this consensus, FERC's interpretation of the FPA concerning the standard for navigability is reasonable and entitled to deference.  The D.C. Circuit recently explained that:

> As the [FPA] does not define when a waterway is "suitable for use . . . in . . . commerce," we assume that Congress intended FERC to address the ambiguity in the statute and develop an appropriate test.  See United States v. Mead Corp., 533 U.S. 218, 229 (2001).  We find that FERC's interpretation of navigability under the FPA, which was based on test canoe trips and the Stream's physical characteristics . . . was reasonable and entitled to deference.

FPL, 287 F.3d at 1156.  FERC thus applied the proper legal test required by the plain language of § 3(8) and the relevant case law.

Substantial evidence supports FERC's factual determination that the Blackstone River is suitable "for the simpler types of commercial navigation." Appalachian Elec. Power Co., 311 U.S. at 416.  FERC properly relied on the September 2000 canoe expedition, which was accomplished with "few problems," "relatively easy" portages, and "a minimum of difficulty."  Knott asserts that the river is prone to dry or low flows and has many natural and constructed obstacles.  However, the statutory

---

Knott also relies on Leonard Murphy, 98 F.E.R.C. 61,302 (2002), but that decision reaffirmed that "[s]ection 3(8) provides that the stream may be found navigable if it was, is, or could be made suitable for such use.  Such suitability may be shown through non-commercial or recreational uses of the stream." Id. at 62,295. Duke Power, 74 F.E.R.C. 61,291 (1996), does not address the navigability question.  Knott's remaining citations predate the Court's landmark decision in Appalachian Electric Power Co., 311 U.S. 377 (1940), a case Knott does not address.

definition of navigability explicitly allows for "land carriage" around "interruptions." 16 U.S.C. § 796(8). Knott does not otherwise seriously dispute that the canoeists successfully navigated the waterway. He questions the participants' motivation, but this is irrelevant; what matters is that the participants completed the journey, regardless of motivation. See FPL, 287 F.3d at 1157 (affirming jurisdiction based on canoe trips made for the purpose of litigation).[3]

FERC's finding that the Blackstone River is navigable, as defined by 16 U.S.C. § 796(8), is supported by substantial evidence. We therefore hold that FERC properly asserted mandatory jurisdiction over the Project.

## III. KNOTT'S CONSTITUTIONAL RIGHTS

Knott argues that a finding of mandatory licensing jurisdiction effects a taking of his private property rights, and that FERC violated his right to due process by denying him an evidentiary hearing on the issue of staff bias.

---

[3]Knott also asserts that FERC has repeatedly reversed itself in determining the navigability of the Blackstone River, thus undermining its most recent order. This argument lacks foundation. FERC's 1987 order issuing Knott a voluntary license made no finding on the navigability issue; FERC's instant order thus presents no conflict. FERC did reverse itself with regard to a project located upstream from Knott's facility, but only after the September 2000 canoe expedition demonstrated the navigability of the river at both locations.

-10-

A.   Fifth Amendment Takings Clause

Knott alleges that mandatory FERC jurisdiction will deprive him of all economically viable use of his deeded right to divert water from the Blackstone River "as he shall see fit."  We lack jurisdiction to hear Knott's taking claim because the Tucker Act, 28 U.S.C. § 1491(a)(1), and "Little Tucker Act," 28 U.S.C. § 1346(a)(2), vest exclusive jurisdiction in the Court of Federal Claims (the district courts have concurrent jurisdiction over claims for $10,000 or less) to render judgment upon any claim against the United States for money damages that "is founded upon the Constitution, or any Act of Congress or any regulation of an executive department."  28 U.S.C. § 1491(a)(1).  Although Knott's petition for review does not specifically seek monetary compensation, the Supreme Court has stated that "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act."  Preseault v. ICC, 494 U.S. 1, 11 (1990).  See also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.").

"Accordingly, a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in

-11-

the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. 498, 520 (1998). The courts have rejected an argument that the FPA represents such a withdrawal of jurisdiction. See Wis. Valley Improvement Co. v. FERC, 236 F.3d 738, 743 (D.C. Cir. 2001) (holding that while petitioner seeking review of FERC orders imposing conditions on its license "may be able to advance a colorable Takings-Clause claim, it is not within our jurisdiction to adjudicate it"). Knott may thus file a takings action in the Court of Federal Claims, but may not pursue it on a petition for review brought under 16 U.S.C. § 825l.

B.   Evidentiary hearing

Knott further alleges that FERC improperly denied him a "true" evidentiary hearing with regard to his "repeated allegations of official government witness bias and factual inaccuracy." We recently rejected a similar claim, and explained that:

> The term "hearing" is notoriously malleable, but what petitioners got here was not only a hearing but a species of evidentiary hearing which is now quite common in utility and carrier regulation. Very extensive evidentiary submissions were made by both sides in the form of affidavits from experts and others, together with extensive written argument . . . .

Cent. Me. Power Co. v. FERC, 252 F.3d 34, 46 (1st Cir. 2001) (citation omitted). We reconfirmed that a "true" hearing before an administrative law judge is unnecessary if any genuine issues of

-12-

material fact can be "adequately resolved on the written record." Id. (citing cases).

The factual issues Knott sought to raise are not issues material to the dispute at hand. The alleged biases of certain FERC staff are irrelevant to a finding of navigability or an order to comply with the terms of Knott's voluntary license. Knott does not dispute that the September 2000 canoeists successfully navigated the Blackstone River and Knott's voluntary license, explicitly requiring him to install gages, predates the alleged biased acts and, thus, cannot be their result. Knott's arguments were thus properly addressed by FERC through a paper hearing.

## IV. ORDERS REQUIRING COMPLIANCE WITH LICENSE AND REGULATIONS

Knott asserts that FERC acted unreasonably in demanding that he file project drawings on microfilm. Under the arbitrary and capricious standard, we consider whether an agency's decision is "based on consideration of the relevant factors" and articulates a "rational connection between the facts found and the choice made." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) (citation omitted). FERC noted that its regulations require exhibit drawings to be microfilmed onto aperture cards, 18 C.F.R. § 4.39, and that "[a]perture cards provide a durable medium for storing information about hydropower project features and are relatively inexpensive to produce, costing about $25-$50 for a set-up fee and one dollar for each original."

FERC also noted that Knott had modified his Project, rendering some of his previous drawings inaccurate. Knott describes the microfilm requirement as "antiquated" and lobbies for an "[i]nfusion of modern technology," but offers nothing further. FERC's decision requiring records to be submitted on microfilm, in conformity with its existing record-keeping system and because of the medium's durability and relatively inexpensive cost, is not overly burdensome and cannot be considered arbitrary or capricious.

Knott also argues that FERC acted arbitrarily in ordering him to install stream flow gages. He contends that such gages are not necessary because other gages exist, and that the license terms requiring such gages do not apply to his Project. These arguments are also unpersuasive. FERC specifically rejected Knott's argument that other gages sufficed to address the issue, finding that those gages were too distant to measure impacts from the Project. Knott's license explicitly requires him to "install and thereafter maintain gages and stream-gaging stations for the purpose of determining the stage and flow of the stream or streams on which the project is located" and to minimize fluctuations such that "flow in the Blackstone River, as measured <u>immediately below the project</u> approximates the instantaneous sum of inflow to the project reservoir" (emphasis added). 39 F.E.R.C. 62,308. FERC decided to enforce these conditions after receiving letters alleging extreme fluctuations in the Blackstone River below the Project, and

-14-

expressions of concern by state agencies and conservation groups that the fluctuations might be the result of Knott's failure to operate his Project to allow a continuous stream flow. Knott's contention that the terms and conditions of the license do not apply to his Project are without merit; the order issuing the license explicitly states that the license is subject to such terms. 39 F.E.R.C. 62,308. FERC's orders for compliance with these terms are reasonable. See Clifton Power Corp. v. FERC, 88 F.3d 1258, 1262 (D.C. Cir. 1996) ("It is simply not unreasonable for FERC to require [licensee] to install [stream gaging] devices to determine whether the dam is operating in the mode described in its license application.").

## CONCLUSION

For the reasons stated, we DENY Knott's petition for review.

**PETITION DENIED**.