OFFICE OF the PEOPLE'S
COUNSEL, Petitioner,

v.

DISTRICT OF COLUMBIA PUBLIC
SERVICE COMMISSION,
Respondent,

Washington Gas Light Company,
Intervenor.

No. 03–AA–513.

District of Columbia Court of Appeals.

Argued March 3, 2004.
Decided March 18, 2004.

Barbara L. Burton, with whom Elizabeth A. Noël, Sandra Mattavous–Frye, Scott H. Strauss, and Andrea G. Lonian, Washington, DC, were on the brief for petitioner.

Christopher G. Lipscombe, with whom Richard A. Beverly, were on the brief, for respondent.

Paul S. Buckley, Washington, DC, with whom Beverly J. Burke, were on the brief, for intervenor.

Before TERRY, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

We review here, on petition of the Office of the People's Counsel (OPC), two rulings of the District of Columbia Public Service Commission (the Commission or the PSC) allowing intervenor Washington Gas Light Company (WGL) to keep fifty percent each of the revenues from two particular business operations. The first ruling concerns WGL's receipt of so-called asset management fees from companies with which it contracts to manage WGL's underutilized gas resources, including upstream pipeline capacity and storage contracts. The second ruling concerns ground-lease income and developers' fees that WGL expects to receive from the

Maritime Plaza development project on the company's East Station property in Southeast Washington, D.C. The OPC argues in each instance that the PSC has failed adequately to explain its decision declining to order all, or substantially more than fifty percent, of these revenues to be credited to WGL's ratepayers in the District of Columbia. As to the asset management fees, it contends that these in essence are no different than fees for "capacity release" which WGL is required by its tariff to return to D.C. ratepayers as a credit against the cost of purchased gas. As to the ground-lease and development fees, OPC argues that because the ratepayers were assessed the full cost of remediating environmental pollution at the Maritime Plaza site—remediation in turn making the commercial development possible—they are entitled to reimbursement of more than half of the expected revenues from the development of the property.

Applying the established standards of judicial review of PSC orders, we hold that the Commission has fully and clearly explained its decision with respect to the asset management fees, but that a remand for further explanation of the 50/50 allocation of revenues from the Maritime Plaza development is necessary to permit this court to exercise its (admittedly limited) review function.

I.

This petition arises from Formal Case No. 989, a consolidated investigation by the PSC of WGL's existing rates and charges for gas service, and adjudication of its application to increase the rates and charges. Only two of the Commission's rulings are presented for review. On the basis of testimony and documentary submissions before it, the Commission made findings of fact as to each issue that, in the main, are not disputed by the parties.

## A.

Regarding the so-called asset management fees, the Commission found that from 1997 on, WGL has entered into arrangements with companies—"asset managers"—that manage and utilize WGL's upstream pipeline and storage capacity in return for fees paid to WGL. In the "test year" of 2000, for example, the management fees applicable to the District of Columbia were approximately $1.3 million. By means of these management arrangements, pipeline and storage capacity rights owned by WGL but not presently used to service its customers are sold in other markets, often when "pooled" with other resources owned by or available to the manager, but in a manner that guarantees a supply of gas to WGL's customers as needed.[1]

The dispute before the Commission revolved around whether the transfer of this idle capacity to asset managers is a traditional "capacity release" or something new and different.[2] All agree that WGL's tariff, last reviewed by the Commission in 1994, requires that the revenues received from conventional release of capacity to third parties be credited to WGL's ratepayers as an offset to the Purchase Gas Adjustment (PGA) originally charged to them. The OPC's expert witness told the Commission that the same rule should be applied to asset management fees:

> Asset management fees are essentially offsets to gas supply costs; they are effectively a reduction in the costs of gas supply resources. As such, all asset management fees received since 1997 should be treated as an offset to gas costs through the PGA.

Otherwise, the expert maintained, WGL would be given a "double recovery" of its costs for providing gas service, all of which—gas supply as well as pipeline and storage capacity—have been borne by the ratepayers through the PGA and other charges. WGL countered that, although asset management does include capacity release to a third party, it is an arrangement considerably more complex than that, "a departure from the way utilities have been traditionally managing resources." The "opportunity for the company to use an asset manager," it told the Commission, "is a recent phenomenon and a direct result of the significant changes in the gas supply market since open access" or partial deregulation. By combining (or bundling) idle pipeline and storage capaci-

---

1. See generally Interstate Natural Gas Ass'n v. Federal Energy Regulatory Comm'n, 350 U.S.App. D.C. 366, 377, 285 F.3d 18, 29 (2002) (mentioning FERC's efforts to "enhanc[e] competition by unbundling various pipe-line services" in recognition "that a significant percentage of pipeline capacity reserved for 'firm' service often went unused"). (In Watergate E. v. District of Columbia Public Serv. Comm'n, 662 A.2d 881, 885 (D.C.1995), this court noted the WGL's "firm" customers are those customers it supplies with natural gas, in contrast to, for example, "interruptible" customers which it supplies with fuel that may be, in its discretion, gas or a substitute fuel, usually oil.)

2. In their briefs, the parties have not provided us with a definition of "capacity release." In Pan–Alberta Gas, Ltd. v. Federal Energy Regulatory Comm'n, 346 U.S.App. D.C. 112, 113, 251 F.3d 173, 174 (2001), the D.C. Circuit explained the meaning of the term as defined by federal regulations partly as follows:

> "Capacity release" describes a transaction in which the holder of a contract for firm transport (the "releasing" shipper) sells that capacity to a "replacement" shipper. The releasing and replacement shippers may agree upon any price up to the applicable reservation charge—the maximum price per unit of firm capacity established in the pipeline's tariff. A shipper seeking to release capacity may either auction it to the highest bidder on a public bulletin board maintained by the pipeline or bypass the auction to contract at the reservation charge with a replacement shipper of its choosing. See 18 C.F.R. § 284.8(a)–(e).

ty with gas supply, the asset manager—so WGL asserted—creates a package that can be sold on the national wholesale market and achieve revenues well beyond those garnered from traditional, "passive" capacity release on bulletin boards or otherwise. WGL therefore proposed a 50/50 split going forward between shareholders and ratepayers of the fees it obtains from asset managers, reflecting the new value created by these transactions but also the fact that the ratepayers bore the cost of the gas resources originally.

The PSC accepted WGL's characterization of asset management fees and its proposed allocation. It determined that active utilization of WGL's pipeline and storage capacity by asset managers "has created new value different from the value of capacity release credits," value that "would not otherwise exist." WGL presented evidence that capacity release independent of the asset management process has little market value, in part because of restrictions that must be imposed on such release to guarantee service to the company's consumers on short notice. Besides the "cumbersome" nature of traditional capacity release credits, the Commission found, WGL's pipeline and storage capacity "have no value unless specially pooled with other similar assets from non-WGL entities" also managed by the asset manager. Because "outside third-party asset managers, unlike an internally developed WGL asset manager, may pool WGL's upstream capacity with similar assets of other non-WGL entities to achieve values for WGL assets that otherwise would not exist," the Commission ruled that "the company should be allowed to keep some share of these asset management fees, both to retain a good outside asset manager[ ] and to provide WGL with an incentive to engage in beneficial management of WGL's upstream capacity." The conclusion that WGL should be allowed

to keep more than its "out-of-pocket expenses" to retain an outside asset manager was buttressed, in the Commission's view, by the company's "extensive unrebutted testimony about the complexity and evolving nature of the asset management marketplace, the increasing difficulties that WGL is experiencing in contracting with asset managers, the importance of the Company's role in developing methods to offset its declining revenue base, and WGL's need to retain a significant share of asset management fees to enter into an effective long-term arrangement with an asset manager at the present time."

Consistent with these findings, the Commission rejected the OPC's argument that WGL's existing tariff required the fees to be rebated to the ratepayers. Unlike WGL's Maryland tariffs, which specifically "provide for WGL sharing asset management fees with ratepayers," its District tariff is silent on such fees, which "first arose during the long period of years [since 1994] when there were no WGL rate cases before this Commission." The District's ratepayers, accordingly, possessed no "tariff entitlement" to past WGL asset management fees, although the 50/50 division would bind the company going forward. Moreover, the Commission explained, the "specific sharing level" of asset management fees could be raised as an issue and revisited in another case then pending before it, Formal Case No. 874.

### B.

Previously, in Formal Case No. 922, the PSC had reviewed the environmental cleanup of WGL's East Station property and ruled that WGL would be allowed to recover the bulk of the environmental assessment and remediation costs from its ratepayers, because those costs "are the

result of gas service that was rendered to ratepayers in the normal course of business." [3] But the Commission also "reserve[d] the option to consider whether ... to require shareholders to participate in the cost of cleanup" in order to "protect ratepayers from inappropriate costs." Moreover, it stated,

if the ratepayers contribute to the costs of the remediation of the East Station site, the ratepayers should share in any profits from the reuse of this property. The result seems compelled by the fact that the ratepayers do not stand to receive any gas service benefit for their investment in the East Station cleanup. Consequently, this approach considers the Company's investment in the land itself as well as [the] ratepayers' investment in the environmental remediation that makes future revenue streams possible.

The PSC was therefore committed "to ensuring that ratepayers receive an equitable share of any proceeds resulting from the sale or lease of East Station," and noted the staff's recommendation "that ratepayers be credited with one-half of any net revenues." But, although agreeing that this might be "a reasonable approach," it noted that the sale or lease of the property had yet to occur and that it might turn out to "be more just and reasonable to provide ratepayers with more than simply 50 percent of the proceeds, based on the evidence that the Commission may receive in a future case." Consequently, "based upon the evidence before [it]" at the time, the PSC "f[ou]nd ... that the 50 percent

ratepayer share is not a threshold, but the minimum to be provided to ratepayers."

By the time of the present proceeding, the East Station plant had become the Maritime Plaza development site, and the PSC revisited the issue of revenue sharing. WGL originally proposed a 50/50 split with the ratepayers subject to a cap at 200 percent of the incremental costs of the development, but withdrew the proposed cap because, as the PSC explained, this would reduce the share to the ratepayers to less than 50 percent. On that basis, the Commission accepted the proposal as "a true 50/50 sharing mechanism," one that was "reasonable"—echoing its previous determination—as reflecting both that WGL's shareholders had "contributed [their] investment in the land itself" and that the ratepayers had "contributed the costs of environmental remediation." The expected income allocable to the District of Columbia for the rate-effective period of three years was approximately $46,000.

## II. Discussion

The OPC makes distinct but related arguments in challenging the PSC's rulings with respect to the two revenue streams at issue, the asset management fees and the revenue derived from the Maritime Plaza development. Regarding the first, it asserts that the Commission did not explain or justify adequately treating asset management fees differently from the traditional release of storage and transport capacity, the proceeds from which WGL's tariff requires be credited to the ratepayers who paid for those resources to begin with.[4] As to Maritime Plaza, the OPC

---

3. The PSC had also noted, among other things, that "the sale o[r] lease of the property may generate significant revenues for WG and its ratepayers," in addition to the advantages to D.C. residents of "a cleaner river and the removal of potentially harmful compounds from soils and water underlying the site."

4. Alternatively, the OPC contends that the PSC stated no reason for giving WGL fifty percent of such fees rather than a lesser percentage, in keeping with ratios the Commission uses for analogous forms of capacity release such as interruptible sales.

does not quarrel with WGL's entitlement to some of the development revenues, but argues that the 50/50 allocation amounts to an unexplained "splitting-the-baby," when the PSC should have attempted to quantify and compare the respective contributions of WGL and its ratepayers to the development, specifically the value of the land and WGL's investment in it, as against the ratepayers' contribution to remediating the environmental pollution.

### A.

■ The scope of this court's review of PSC orders "is narrow." *Office of the People's Counsel v. Public Serv. Comm'n,* 797 A.2d 719, 725 (D.C.2002):

[W]e must evaluate whether the Commission's material factual findings are supported by substantial evidence in the record.

If those findings are thus supported, then the substantial evidence test is satisfied so long as the Commission fully and clearly explains its decision and demonstrates a rational connection between facts found and the choice made. In evaluating the Commission's rationale, we bear in mind that it is especially important to accord great respect to the Commission in a complex, esoteric area such as ratemaking in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies. Because theories of ratemaking in particular fall within the special province of the PSC, such theories are not subject to the same substantiation principle applicable to fact-finding.... [Moreover, q]uestions of regulatory policy, as distinct from questions of law, are beyond both the jurisdiction and the competence of a reviewing court.

*Id.* at 726–27 (citations and internal quotation marks omitted). Stated otherwise, once the PSC sufficiently explains its ruling, "the petitioner challenging its order

assumes 'the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken.'" *Watergate E., supra* note 1, 662 A.2d at 886; *see also* D.C.Code § 34–606 (2001) ("[T]he review by the Court shall be limited to questions of law ...; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings ... are unreasonable, arbitrary, or capricious."). Applying these standards, we consider first the OPC's attack upon the asset management fees, then its challenge to the Maritime Plaza revenues. The OPC concedes that both decisions of the Commission implicate its special ratemaking expertise. *See* Reply Br. for OPC at 7–8.

### B.

■ The OPC's disagreement with the Commission's ruling as to the asset management fees is primarily one of characterization. Because, in the OPC's view, those fees are essentially no different than revenues derived from conventional forms of release of unused pipeline and storage capacity, it asserts that the Commission has offered no reason why the fees should not be credited entirely to the ratepayers just as WGL's tariff requires it to credit revenues from capacity release or interruptible sales. The OPC's claim, in essence, is that WGL receives a "double recovery" of its costs by profiting from the sale of capacity on the open market even though the ratepayers reimbursed the company for the cost of that capacity originally.

The PSC, however, received extensive evidence from WGL, both testimonial and documentary, that asset management agreements differ substantively from normal capacity release and create value from exploiting underused capacity that is not otherwise realizable. WGL informed the Commission, for example, that at the present time "capacity released for short or long periods of time and conditioned by

the ability of Washington Gas to recall such capacity upon very short notice to serve its customers is valued by the marketplace at close to zero." Asset management agreements, by contrast, enable the company to enter "longer term arrangements" with firms engaged in "extensive gas trading operations" who can, among other things, "pool WGL's upstream capacity with similar assets of non-WGL entities" and sell it in other markets, creating "values for WGL assets that otherwise would not exist." [5] The PSC credited this evidence, and the OPC does not really dispute its finding that alliances with such managers yield greater revenues from marketing unutilized capacity than would otherwise be the case. *See, e.g.,* para. 47 of the Commission's Reconsideration Order, noting OPC's "conce[ssion] that if the Company did not retain an asset manager, certain benefits would not otherwise exist." The OPC nevertheless makes several arguments why the fees from these transactions should be passed through to the ratepayers, either entirely or in much greater proportion than fifty percent.

Citing testimony of its expert, the OPC points to the fact that since 1997 WGL has retained asset management fees "without any Commission review or approval" and in "deviation from the WGL tariff." Br. for OPC at 19–20.[6] But this essentially begs the question of whether the fees are embraced by the existing tariff requirement that capacity release revenues be credited to the ratepayers. After hearing competing testimony on the issue, the PSC concluded that they are not, for the reasons already mentioned. Reflecting the novelty of asset management arrangements, the Commission found that those agreements first became an issue "during the long period of years when there were no WGL rate cases before the Commission," and so they were not covered by the company's existing D.C. tariff.[7] And while "there are some situations, such as those involving the construction of a new gas plant, where the statutes require a utility to obtain the advance permission and approval of the Commission," there is "no statutory or regulatory requirement ... that WGL seek advance Commission approval of its asset management program." Consequently, the PSC explained, the fact that WGL's tariffs in Maryland "specifically provide for WGL sharing asset management fees with ratepayers" merely confirmed the Commission's authority—faced with the issue for the first time—to require the fees to be shared "[o]n a going-forward basis," but did not make WGL's past retention of those fees unlawful or require a (problematically) retroactive crediting of any portion of them to the ratepayers. The OPC has not convinced us that this reasoning and conclusion is ill-founded, much less that it is "fatal[ly] flaw[ed]." *Watergate E.,* 662 A.2d at 886.

To support its argument that asset managements are *not* novel (hence are embraced by WGL's existing tariff) the OPC points to language in WGL's "Master Service" agreements with its asset managers that explicitly describes the asset transfer

---

5. WGL gave as an example "a multi-year, five to 15 year, Strategic Alliance" it was planning to enter with an asset manager who would "use all of WGL's assets, *i.e.,* transportation, storage, and gas supply resources, as well as its own financial trading assets, to enhance the overall profits of the Alliance."

6. The OPC apparently made no attempt to challenge the fees prior to the present (2002)

proceedings, and does not seriously argue that since 1997 WGL has somehow concealed the fact that it was receiving them.

7. The PSC noted that WGL's last contested rate case had been in 1992, followed by "a non-unanimous settlement of WGL's rates in 1994."

as capacity release. WGL, however, addressed this argument in (among other submissions) a "proprietary" response to questions posed by the PSC in which it explained how capacity release forms only a sub-part of the relationship with its asset managers that involves much more complex transactions. The Commission credited this explanation by citing to it repeatedly in its conclusion that asset managers "create[ ] ... new value for WGL." *See, e.g.,* Order on Reconsideration at notes 156, 157. The OPC's single-sentence claim to us that the PSC did not "reconcil[e]" WGL's own references to capacity release with treating asset management agreements as *sui generis* does not demonstrate error in the Commission's analysis.

Finally, the OPC argues that even if the PSC properly decided WGL is entitled to "some share of the[ ] asset management fees," it "failed to present any basis for the 50/50 ratio it adopted." Br. for OPC at 22. In Maryland, the OPC told the Commission, WGL is allowed to retain only twenty percent of such revenues—to which WGL countered that Virginia treats asset management revenues in accordance with WGL's proposal. We think the Commission's choice of a 50/50 allocation was more than adequately explained. The Commission took into account several factors in arriving at that division, beginning with the incentives it believed necessary to leave in place for WGL "to retain a good outside asset manager[ ] and ... to engage in beneficial management of WGL's upstream capacity." Although the OPC argued that, as a regulated company, WGL is duty-bound anyway to engage in "beneficial management," there is a meaningful difference between holding a regulated company to minimum obligations of stewardship and rewarding creative asset utilization in a changing market for those resources, as the Commission found the asset management agreements to be. The PSC further recognized "the complexity

and evolving nature of the capacity management marketplace," including "the increasing difficulties" WGL claimed to be "experiencing in contracting with asset managers" and the corresponding "need to retain a significant share of asset management fees to enter into an effective long-term arrangement with an asset manager." Permitting the retention of fees as working capital, so to speak, for developing relations with management companies that are increasingly difficult to find (WGL told the Commission that "[o]utside asset managers have declined in number and quality") is not unreasonable policy, and well within the PSC's authority. Furthermore, the Commission pointed out that "the specific sharing level" could be "raised as an issue and revisited" in another pending case, Formal Case No. 874, something the OPC only conclusorily dismisses. Lastly, unlike its argument concerning the Maritime Plaza development fees, *infra,* the OPC points to no consideration the Commission overlooked or failed to address adequately in arriving at the even apportionment. In short, the OPC's description of the 50/50 allocation as an arbitrary "splitting-of-the baby" is not substantiated by the record, and does not warrant our disturbing that exercise of the Commission's ratemaking expertise.

### C.

We reach a different conclusion as to the Maritime Plaza development fees, because the Commission has not "fully and clearly" explained its reasons for allocating fifty percent of the expected revenue stream each to WGL and the ratepayers. *Office of People's Counsel,* 797 A.2d at 726. In contrast to the comprehensive discussion of the asset management fees in its original order, the Commission initially explained its acceptance of WGL's proposed ratio of 50/50 for the Maritime Plaza development with a single-sentence conclusion that it was "fair to ratepayers, in that

there is a true 50/50 sharing mechanism without a cap [based on incremental costs, as WGL had proposed]." In denying the OPC's request for reconsideration, the Commission added that the apportionment was "completely consistent with our earlier ruling in Formal Case No. 922 that a 50/50 split ... is a reasonable approach" reflecting both WGL's "investment in the land itself" and the ratepayers' contribution of "the costs of environmental remediation." The PSC did not appear to question the OPC's assertion that the ratepayers had borne the *entire* cost of the cleanup despite the Commission's earlier reservation of "the option ... to require shareholders to participate in [that] cost." Nor did it attempt to quantify the respective contributions, specifically to valuate the land (or WGL's investment in it) minus the remediation paid for by the ratepayers. Indeed, the OPC argues, the land may have had a negative value without the remediation, and thus—for all the record shows—the ratepayers may have made a substantially greater contribution to its value than the shareholders.

We believe these issues must be confronted more directly than the Commission has done so far in its orders. At oral argument WGL disputed the OPC's argument by contending that its innovative measures toward rehabilitating the site had reduced the remedial costs to the ratepayers greatly, and that the apportionment formula properly reflected the Commission's belief that such endeavors should be rewarded and stimulated. This may all be true,[8] but the Commission's analysis does not address it and in particular does not answer the OPC's assertion that a valuation of the property may reveal that its income-earning potential rests disproportionately on the ratepay-

ers' cleanup contributions rather than WGL's own investment, making a 50/50 apportionment arbitrary. The Commission's order in Case No. 922 explained that "any sharing mechanism must consider the appropriate manner in which to adjust rates to reflect [the] ratepayers' due share of the proceeds." Moreover, although that order said that the final allocation would be "based on the evidence that the Commission may receive in a future case," its present order points to no such evidence other than WGL's "investment in the land"—without quantification—as the basis for the equal apportionment. That is insufficient even when measured by the deferential standard of review we apply to policy-laden judgments of this kind. The parties recognized at oral argument that the projected income from the development may increase substantially in the future, and although the current apportionment applies only to the rate-effective period (three years), it is likely to have something like presumptive weight in a future determination of how the revenues are to be shared. The necessity for the allocation to rest on more than the generalized explanation for a 50/50 ratio that the PSC has advanced so far is therefore apparent.

### III.

To conclude, we affirm the Commission's ruling with respect to the asset management fees, but vacate its order with respect to the Maritime Plaza development and remand for further consideration of the income-allocation issue.

*So ordered.*

8. It does appear, though, that as part of its request to increase rates WGL was seeking to recover dollar-for-dollar its environmental costs for the site allocable to the District of Columbia. See pages 73–74 of the Commission's Opinion and Order.